NO.    25-4438

In The
# United States Court of Appeals
For The Fourth Circuit

UNITED STATES OF AMERICA,
Appellee,

v.

BRANDON RUSSELL,
Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE  DISTRICT OF MARYLAND                    AT   BALTIMORE

OPENING PRINCIPAL BRIEF OF APPELLANT

MICHAEL UFFERMAN
Michael Ufferman Law Firm, P.A.
2022-1 Raymond Diehl Road
Tallahassee, Florida 32308
(850) 386-2345
ufferman@uffermanlaw.com

Counsel for  Appellant Russell

## B. TABLE OF CONTENTS

Page

A.    COVER PAGE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . attached

B.    TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

C.    TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

      1.    Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

      2.    Statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

      3.    Other. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

D.    JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . x

E.    STATEMENT OF THE ISSUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

F.    STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      1.    Course of the Proceedings and Disposition Below. . . . . . . . . . . . . . 2

      2.    Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

G.    SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

H.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      The district court erred by denying Appellant Russell's (1) motion to compel the Government (a) to provide notice of its Section 702 surveillance of his communications or otherwise affirm or deny the surveillance and (b) to disclose all of Appellant Russell's communications that were the product of such surveillance and (2) request that the court unseal the portions of the materials and report from the *ex parte* conference that relate to the Government's Section 702 surveillance of Appellant Russell. . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

J.    REQUEST FOR ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

K.    CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . attached

## C.  TABLE OF AUTHORITIES

Page

### 1.    Cases

*Berger v. New York*, 388 U.S. 41 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 28

*Brady v. Maryland*, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 42

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) . . . . . . . . . . . . . . . . . . . . . . . 33

*Clark v. Martinez*, 543 U.S. 371 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Dalia v. United States*, 441 U.S. 238 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Askin*, 47 F.3d 100 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Evans*, 452 F.2d 1239 (D.C. Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Grand Jury Investigation*, 431 F. Supp. 2d 584 (E.D. Va. 2006). . . . . . 22-25

*In re Grand Jury Matter*, 683 F.2d 66 (3d Cir. 1982) . . . . . . . . . . . . . . . . . . 45-46

*In re Grand Jury Proc.*, 524 F. Supp. 87 (E.D. Pa. 1981). . . . . . . . . . . . . . . . . . 19

*In re Grand Jury Subpoena (T-112)*, 597 F.3d 189 (4th Cir. 2010) . . . . . . . . . . . 19

*Jencks v. United States*, 353 U.S. 657 (1957) . . . . . . . . . . . . . . . . . . . . . . . 28-29

*Katz v. United States*, 389 U.S. 347 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Kolod v. United States*, 390 U.S. 136 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Matter of Archuleta*, 434 F. Supp. 325 (S.D.N.Y. 1977). . . . . . . . . . . . . . . . . 19, 24

*Murray v. United States*, 487 U.S. 533 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Nix v. Williams*, 467 U.S. 431 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Roviaro v. United States*, 353 U.S. 53 (1957) . . . . . . . . . . . . . . . . . . . . . . 28-29, 45

iv

*Smith v. Black*, 904 F.2d 950 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Alderman*, 394 U.S. 165 (1969). . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Al-Timini*, Crim. No. LMB-04-0385,
        2014 WL 12957760 (E.D. Va. Apr. 28, 2014) . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Amawi*, 695 F.3d 457 (6th Cir. 2012) . . . . . . . . . . . . . . . . . . . 29

*United States v. Apple*, 915 F.2d 899 (4th Cir. 1990) . . . . . . . . . . . . . . . . . *passim*

*United States v. Aref*, 533 F.3d 72 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Belfield*, 692 F.2d 141 (D.C. Cir. 1982) . . . . . . . . . . . . . . 9, 26, 30

*United States v. Caro*, 597 F.3d 608 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . 42

*United States v. Carter*, No. 19-cr-819, 2020 WL 7490401
        (N.D. Ill. Dec. 21, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-21, 24

*United States v. D'Andrea*, 495 F.2d 1170 (3d Cir. 1974) . . . . . . . . . . . . . . . . . 19

*United States v. Dugan*, 136 F.4th 162 (4th Cir. 2025). . . . . . . . . . . . . . . . . . . . 10

*United States v. Freitas*, 800 F.2d 1451 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . 28

*United States v. Gaines*, 668 F.3d 170 (4th Cir. 2012) . . . . . . . . . . . . . . . . . . 38-39

*United States v. Gamez-Orduno*, 235 F.3d 453 (9th Cir. 2000) . . . . . . . . . . . . . 27

*United States v. Gorman*, 859 F.3d 706 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . 34

*United States v. Hasbajrami*, 945 F.3d 641 (2d Cir. 2019) . . . . . . . . . . . . . . . . . 18

*United States v. James*, 609 F.2d 36 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Johns*, 891 F.2d 243 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . 34, 39

*United States v. Khan*, No. 12-cr-659, ECF No. 59 (D. Or. Apr. 3, 2014) . . . . . . 41

*United States v. Leon*, 468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Lundin*, 817 F.3d 1151 (9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . 39

*United States v. Mejia*, 448 F.3d 436 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Moalin*, 973 F.3d 977 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Moussaoui*, 382 F.3d 453 (4th Cir. 2004) . . . . . . . . . . . . . . . 28, 45

*United States v. Najjar*, 300 F.3d 466 (4th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Nicka*, Crim. No. RWT-10-0777,
    2013 WL 12187497 (D. Md. Oct. 15, 2017) . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Osborne*, 424 F. Supp. 70 (E.D. Pa. 1976) . . . . . . . . . . . . . . 20, 24

*United States v. Pacella*, 622 F.2d 640 (2d Cir. 1980). . . . . . . . . . . . . . . . . . . . . 21

*United States v. Ramirez-Sandoval*, 872 F.2d 1392 (9th Cir. 1989) . . . . . . . . . . . 39

*United States v. Seidman*, 156 F.3d 542 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . 34

*United States v. Shinnick*, 546 F.2d 420 (3d Cir. 1976) . . . . . . . . . . . . . . . . . . . . 21

*United States v. Soto-Zuniga*, 837 F.3d 992 (9th Cir. 2016) . . . . . . . . . . . . . . . . 42

*United States v. U.S. Dist. Court (Keith)*, 407 U.S. 297 (1972) . . . . . . . . . . . . . . 31

*United States v. Vielguth*, 502 F.2d 1257 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . 17

*United States v. Weiner*, 418 F. Supp. 941 (M.D. Pa. 1976) . . . . . . . . . . . . . . 20-21

*United States v. Williams*, 615 F.3d 657 (6th Cir. 2010). . . . . . . . . . . . . . . . . . . . 39

*Wong Sun v. United States*, 371 U.S. 471 (1963) . . . . . . . . . . . . . . . . . . . . . . . 34, 38

**2. Statutes**

18 U.S.C. § 1366(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x, 2

18 U.S.C. § 2518 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

18 U.S.C. § 2703(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

18 U.S.C. § 3504 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3504(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16-17

18 U.S.C. § 3504(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 25

18 U.S.C. § 3504(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

50 U.S.C. § 1801(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1117

50 U.S.C. § 1806 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

50 U.S.C. § 1806(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

50 U.S.C. § 1806(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

50 U.S.C. § 1881a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11-12

50 U.S.C. § 1881a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

50 U.S.C. § 1881e(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Classified Info. Proc. Act, 18 U.S.C. App. III . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

### 3.  Other

2 David Kris & J. Douglas Wilson, National Security Investigations and Prosecutions § 26:5 (3d ed. 2019, rev. 2023) . . . . . . . . . . . . . . . . . . . . . . . 44

2 Fed. Prac. & Proc. Crim. § 254 (4th ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Director Wray's Remarks to the ABA Standing Committee on Law and National Security*, FBI (Apr. 9, 2024), https://bit.ly/3X1ieoA . . . . . . 12, 35

Fed. R. App. P. 4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

Fed. R. App. P. 28(a)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

Fed. R. App. P. 28(a)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

Fed. R. App. P. 28(a)(4)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

Fed. R. App. P. 28(a)(4)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

Fed. R. Crim. P. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Crim. P. 16(a)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Fed. R. Crim. P. 16(a)(1)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 45

Human Rights Watch, *Dark Side: Secret Origins of Evidence in U.S. Criminal Cases* (Jan. 9, 2018), https://perma.cc/YWW2-3KRW . . . . . . . . 32

Press Release, *Maryland Woman and Florida Man Charged Federally for Conspiracy to Destroy Energy Facilities*, Dep't of Just. (Feb. 6, 2023), https://perma.cc/N3PS-8XP9 . . . . . . . . . . . . . . . . . . . . 13, 15

Pub. Safety Can., *Currently Listed Entities*, https://perma.cc/R97U-P5H6 (last visited July 27, 2024). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Report on the Surveillance Program Operated Pursuant to Section 702 of FISA*, Priv. & Civ. Lib. Oversight Bd. 58 (Sept. 28, 2023), https://perma.cc/8UGZ-9KPN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

Sakellariadis, John, *FBI Reveals Controversial Spy Tool Foiled Terror Plot as Congress Debates Overhaul*, Politico (Feb. 13, 2024), https://politi.co/3SPh5Op . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 22, 35

Savage, Charlie, *Door May Open for Challenge to Secret Wiretaps*, N.Y. Times, Oct. 16, 2013, https://nyti.ms/36ccH0G . . . . . . . . . . . . . . . . . 36

S. Rep. 95-701, 63, *as reprinted in* 1978 U.S.C.C.A.N. 3973. . . . . . . . . . . . . . . 17

Taitz, Sarah & Patrick Toomey, *Concealing Surveillance: The Government's Disappearing Section 702 Notices*, Just Security (Sept. 27, 2023), https://perma.cc/WCR8-QBLJ . . . . . . . . . . 36

U.K. Home Off., *Proscribed Terrorist Groups or Organisations* (Apr. 26, 2024), https://perma.cc/8VC5-X453 . . . . . . . . . . . . . . . . . . . . . . 15

U.S. Const., Art. III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

U.S. Const. amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 27

U.S. State Dep't, *Country Reports on Terrorism 2022: Australia*, https://perma.cc/28MS-VFNC (last visited July 27, 2024). . . . . . . . . . . . . 15

*Warrant Requirement for FBI's Section 702 Queries Would Impede Investigations*, FBI (Apr. 9, 2024), https://bit.ly/3WKnXO5 . . . . . . . . . . 12

## D. JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231 for a criminal prosecution of "offenses against the laws of the United States." The Government charged Brandon Russell (hereinafter "Appellant Russell") with conspiracy to damage an energy facility in violation of 18 U.S.C. § 1366(a). *See* Fed. R. App. P. 28(a)(4)(A).

This Court has jurisdiction under 28 U.S.C. § 1291, as this is an appeal of a "final decision" by the district court. *See* Fed. R. App. P. 28(a)(4)(B), (D).

The judgment was filed on August 7, 2025. (JA995). The notice of appeal was timely filed on August 11, 2025. (JA1001). *See* Fed. R. App. P. 4(b), 28(a)(4)(C).

## E.  STATEMENT OF THE ISSUE

The district court erred by denying Appellant Russell's (1) motion to compel the Government (a) to provide notice of its Section 702 surveillance of his communications or otherwise affirm or deny the surveillance and (b) to disclose all of Appellant Russell's communications that were the product of such surveillance and (2) request that the court unseal the portions of the materials and report from the *ex parte* conference that relate to the Government's Section 702 surveillance of Appellant Russell.

## F. STATEMENT OF THE CASE

### 1. Course of the Proceedings and Disposition Below.

Appellant Russell – who is currently incarcerated – was charged with conspiracy to damage an energy facility in violation of 18 U.S.C. § 1366(a). (JA025). The indictment also charged Sarah Beth Clendaniel as a co-conspirator. In May of 2024, Ms. Clendaniel pled guilty to a superseding indictment.

During the proceedings below, Appellant Russell was represented by Ian J. Goldstein, Esquire.[1] The Government was represented by Assistant United States Attorneys Michael F. Aubin, Joseph R. Baldwin, and Kathleen O. Gavin. The Honorable James K. Bredar presided over the proceedings below.

Appellant Russell's jury trial began on January 27, 2025, and concluded on February 3, 2025. At the conclusion of the trial, the jury found Appellant Russell guilty as charged. (JA979; JA945).

Appellant Russell was sentenced on August 7, 2025. The district court sentenced Appellant Russell to twenty years' imprisonment followed by a lifetime of supervised release. (JA995).

---

[1] Attorneys with the American Civil Liberties Union Foundation represented Appellant Russell in relation to his pretrial motions to compel.

**2.    Statement of the Facts.**

The facts from the trial were summarized in one of the district court's orders:

At trial, one of the Government's key witnesses was an undercover informant who testified under the pseudonym "Christopher Jackson." Jackson testified as to conversations he had with Russell and Russell's co-conspirator, Sarah Beth Clendaniel, regarding their plot to destroy various electrical substations near Baltimore, Maryland. . . .

. . . .

Jackson began his direct testimony by explaining that he worked as a "confidential human source" ("CHS") for the FBI. (ECF No. 235 at 3.) He stated that as a CHS, he was not an employee of the FBI, but was instead an independent agent who would "go into online spaces, whether it be on [the messaging app] Telegram or in other places, to identify potentially illegal activity or those that would like to do violence." (Id. at 4.) Jackson testified that he had worked as a CHS for "(a)round four years" and that, over the course of those four years, he "received approximately $70,000" from the FBI. (*Id.*) Of that amount, he said, "about 40,000" was for "actual payment," and "30,000 was [for] reimbursements for various expenses that [he had incurred] in the course of this work," such as purchasing a separate phone and buying airplane tickets. (*Id.* at 4-5.)

Jackson testified that, around June of 2022, he first became aware of a Telegram user who went by the name "Homunculus." (*Id.* at 7.) Homunculus had posted on Telegram a manifesto called "Make It Count," which espoused a violent white supremacist ideology and, among other things, exhorted readers to destroy the electrical grid as a means of subverting society. (*Id.*) Jackson downloaded "Make It Count," and the document was introduced into evidence. (*Id.* at 9-10.) Jackson eventually began messaging with Homunculus directly on Telegram. Jackson testified to the content of his text conversations with Homunculus, which Jackson had preserved by taking screenshots. (*See generally id.* at 8-19.) Jackson testified that, among other discussions, Homunculus encouraged him to shoot electrical substations to cause a "cascading failure" of the electrical grid, ideally after a winter

3

snowstorm so as to destroy the system when the demand on the grid is at its peak. (*See generally* id. at 28-60.) "Putting holes in transformers," Homunculus told Jackson, "is the greatest thing someone can do." (*Id.* at 28.) These discussions began as fairly abstract, but evolved into planning for a specific attack in the fall of 2022 after Homunculus learned that Jackson lived in Maryland. Homunculus said to Jackson, "someone else I know in Maryland . .. is going to be doing the same thing as you." (*Id.* at 43-44.) Homunculus explained that this other individual, who went by the alias "Nythra," wanted to mount an attack against electrical substations but was unable to obtain a firearm because of a prior felony conviction; he asked Jackson if he could help her by obtaining a gun and 3-D printing some accessories, and he shared Jackson's contact information with her. (*Id.* at 44-51.) Jackson testified about further conversations he had with Homunculus after Jackson had connected with Nythra, including additional discussions about logistical details such as the location and timing of the planned attack. (*Id.* at 48-60.) These conversations, which included text communications and one phone call (which was recorded and an excerpt of which was played for the jury), lasted until January 2023. (*Id.*) Homunculus's statements to Jackson suggested that Homunculus had been separately communicating with Nythra directly about the plan. (*See, e.g., id.* at 53 (Homunculus stating, in response to Jackson's question about whether the location for the planned attack had been identified, "[y]es, don't worry"); *id.* at 57 (Homunculus stating, in response to Jackson's questions about the viability of the plan, that "it's been studied so don't fret").)

Jackson also testified about conversations he had with Nythra, who also sometimes went by "Kali." As with Jackson's testimony about Homunculus, all of Jackson's testimony about Nythra referred to conversations that were recorded, and these recordings were shown to the jury, either in the form of screenshots of textual conversations or audio playbacks of telephone calls. (*See generally id.* at 60-98.) These conversations indicated that Nythra had known Homunculus for several years, that Homunculus had "vouched" for Jackson, and that Nythra was familiar with "openinframap," a website containing information about infrastructure that Homunculus had repeatedly publicized. (*Id.*) Jackson testified to his conversations with Nythra about their planned attack

against electrical substations around Baltimore.

. . . .

Other witnesses gave testimony that tended to show that Homunculus[] was Russell, and that Nythra/Kali was Clendaniel. For example, FBI agent Andrea Bedford testified as to a forensic analysis of devices obtained from a search of Russell's residence, which indicated that Russell was associated with the username[] "Homunculus[.]" And FBI agent Terryan Bums testified that she retrieved a cell phone from a search of Clendaniel's residence, and that a forensic analysis of the phone uncovered chat conversations between "Nythra" and "Teddy K," an alias for Jackson.

(JA980-994) (footnotes omitted).

## G.  SUMMARY OF ARGUMENT

The district court erred by denying Appellant Russell's (1) motion to compel the Government (a) to provide notice of its Section 702 surveillance of his communications or otherwise affirm or deny the surveillance and (b) to disclose all of Appellant Russell's communications that were the product of such surveillance and (2) request that the court unseal the portions of the materials and report from the *ex parte* conference that relate to the Government's Section 702 surveillance of Appellant Russell.  In his motion to compel, Appellant Russell raised several arguments in support of his request for notice/disclosure: (1) the Government must affirm or deny the surveillance of Appellant Russell under 18 U.S.C. § 3504; (2) due process entitles Appellant Russell to notice of the Section 702 surveillance and disclosure of his intercepted communications; (3) Appellant Russell is entitled to notice under 50 U.S.C. § 1806(c); and (4) Rule 16 of the Federal Rules further requires the Government to provide notice.  Appellant Russell also argued that the district court should have unsealed the Government's *ex parte* submissions and the district court's *ex parte* report.

Regarding the Section 3504 claim, the district court concluded that Appellant Russell has not shown a "colorable basis" sufficient to trigger Section 3504 (i.e., the district court concluded that Appellant Russell has not established a "colorable basis"

6

to believe that he is a "party aggrieved").  Contrary to the district court's conclusion, Appellant Russell's allegations are *not* "speculative," "bare," or "unsubstantiated"; rather, Appellant Russell's claim is based on reasonable inferences gleaned from *eleven specific facts* in the FBI's disclosures about its use of warrantless Section 702 queries – and the fact that no other public prosecution contains allegations consistent with the FBI's statements.  Because Appellant Russell is, in fact, a "party aggrieved" under Section 3504, the district court should have required the Government to affirm or deny the existence of Section 702 surveillance under Section 3504.  Consistent with this Court's holding in *United States v. Apple*, 915 F.2d 899, 911 (4th Cir. 1990), Appellant Russell's judgment "must be vacated and remanded for further proceedings under 18 U.S.C. § 3504(a)(1)."

**H.  ARGUMENT**

The district court erred by denying Appellant Russell's (1) motion to compel the Government (a) to provide notice of its Section 702 surveillance of his communications or otherwise affirm or deny the surveillance and (b) to disclose all of Appellant Russell's communications that were the product of such surveillance and (2) request that the court unseal the portions of the materials and report from the *ex parte* conference that relate to the Government's Section 702 surveillance of Appellant Russell.

On August 14, 2024 (i.e., prior to the trial in this case), Appellant Russell filed a motion to compel the Government to affirm or deny surveillance conducted under Section 702 of the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1881a.  (JA161).  In the August 14, 2024, motion to compel, Appellant Russell explained that on June 11, 2024, he filed a motion to compel[2] the Government to provide notice of Section 702 surveillance of his communications.  The June 11, 2024, motion to compel was based on public statements by FBI Director Christopher Wray and a senior FBI official.  A hearing on the June 11, 2024, motion to compel was held on June 27, 2024.  (JA080).  At that hearing, (1) the district court denied Appellant Russell's June 11, 2024, motion to compel without prejudice (JA145), and (2) the district court concluded that it would hold an *ex parte*, in camera conference with the Government so it could provide an "answer to the question of whether it used Section 702 in any way in its investigation or prosecution of Defendant."

---

[2] (JA029).

8

(JA160). The *ex parte* conference was held on July 23, 2024. Following the *ex parte* conference, the district court concluded that Appellant Russell was *not* entitled to notice under FISA, though the court's public discussion did not describe the factual or legal basis for that conclusion. (JA160).

Because the Government did not provide notice under FISA, Appellant Russell filed the August 14, 2024, motion to compel the Government to affirm or deny its use of Section 702 surveillance pursuant to 18 U.S.C. § 3504(a). Appellant Russell also moved for the disclosure of his communications intercepted pursuant to Section 702, as a matter of due process and as contemplated by *United States v. Belfield*, 692 F.2d 141, 146 & n.22 (D.C. Cir. 1982). In addition, Appellant Russell sought notice and disclosure pursuant to Rule 16 of the Federal Rules of Criminal Procedure, and he renewed his motion for notice pursuant to the Constitution and FISA. Finally, Appellant Russell requested that the district court unseal the portions of the materials and report from the July 23, 2024, *ex parte* conference that relate to the Government's Section 702 surveillance of Appellant Russell.

Following a response from the Government (JA202) and a reply from Appellant Russell (JA235), the district court denied Appellant Russell's August 14,

2024, motion. (JA254).[3] For the reasons set forth below, the district court erred by denying Appellant Russell's August 14, 2024, motion.[4]

    1.    Background

    a.    Section 702 authorizes warrantless, dragnet surveillance of Americans

The Government uses Section 702 to warrantlessly intercept billions of communications sent and received by hundreds of thousands of individuals, including Americans. *See, e.g.*, *Report on the Surveillance Program Operated Pursuant to Section 702 of FISA*, Priv. & Civ. Lib. Oversight Bd. 58 (Sept. 28, 2023), https://perma.cc/8UGZ-9KPN (hereinafter, "PCLOB Report"). Under the statute, the Government is authorized to "target" any non-U.S. person abroad who is likely to

---

[3] In the district court's memorandum/order, the district court stated the following:

> The Court has prepared a separate, *ex parte* classified Report on the Conference, which the Court will issue simultaneously with this unclassified Memorandum. The Report, along with the Government's classified written submissions, will be stored in a manner appropriate for their classification status and will be preserved so that they may be made available during any future appellate review.

(JA160). The classified report is ECF number 144.

[4] In the absence of factual findings, the Court reviews *de novo* a district court's denial of a motion to compel; otherwise, the Court reviews the district court's ruling for abuse of discretion. *See United States v. Dugan*, 136 F.4th 162, 168 (4th Cir. 2025).

communicate "foreign intelligence information." 50 U.S.C. §§ 1881a(a), 1801(e).

Targets need not be suspected of any wrongdoing. Because many of the targeted

foreigners communicate with friends, family, business contacts, and others in the

United States, the Government's surveillance routinely sweeps up Americans whose

communications are entitled to constitutional protection. 50 U.S.C § 1881a(a);

PCLOB Report. The Government stores the intercepted communications in

databases, retains them for years, and searches them repeatedly for information about

Americans – including in domestic criminal investigations. *See* PCLOB Report

78–79, 88, 93, 98–99. This surveillance takes place inside the United States, with the

compelled assistance of major communications providers and technology companies.

*Id.* at 2, 64–65.

All of this surveillance is conducted without a finding of probable cause,

without a warrant, and without individualized judicial approval. With respect to U.S.

persons, Section 702 allows the Government not just to warrantlessly collect, but to

retain, query, review, and use U.S. persons' communications with targeted persons.

No court reviews the Government's targets or approves the Government's subsequent

use of this surveillance to investigate individual Americans. The Foreign Intelligence

Surveillance Court ("FISC") has only limited involvement, conducting an annual

review of the general procedures the Government proposes to use. *See* 50 U.S.C. §

11

1881a.

b.    <u>Appellant Russell's communications were surveilled under Section 702</u>

Appellant Russell has ample reason to believe that his communications were both collected and searched under Section 702 without a warrant. In 2024, as Congress debated whether to reauthorize Section 702, the FBI made a set of extraordinarily rare public disclosures aimed at showing the purported value of this surveillance. The disclosures appear in three sources:

> (1) An article published by Politico in February 2024, which cites "newly declassified" information from a senior FBI official. *See* John Sakellariadis, *FBI Reveals Controversial Spy Tool Foiled Terror Plot as Congress Debates Overhaul*, Politico (Feb. 13, 2024), https://politi.co/3SPh5Op (Ex. A, Mot., ECF No. 107) ("Politico Article"). (JA043).

> (2) A speech by FBI Director Wray on April 9, 2024, to the American Bar Association. *See Director Wray's Remarks to the ABA Standing Committee on Law and National Security*, FBI (Apr. 9, 2024), https://bit.ly/3X1ieoA (Ex. B, Mot., ECF No. 107) ("Wray Speech"). (JA049).

> (3) An FBI news story describing FBI Director Wray's speech. *See Warrant Requirement for FBI's Section 702 Queries Would Impede Investigations*, FBI (Apr. 9, 2024), https://bit.ly/3WKnXO5 (Ex. C, Mot., ECF No. 107) ("FBI News Story"). (JA060).

The FBI's public disclosures conform precisely to the Government's allegations in this case. The FBI disclosed eleven specific details about the surveillance, all of which are present here, as shown in the table below. Based on Appellant Russell's

defense counsel's review of public federal criminal dockets and Department of Justice press releases since January 2023, Appellant Russell's case is *the only prosecution* that tracks each and every detail in the FBI's disclosures.

| No. | FBI Disclosures | Corresponding Allegations in this Case |
|---|---|---|
| 1 | *An alleged "terrorist" attack or plot*<br><br>Politico Article at 1-3, 5. | *The government refers to the prosecution as involving domestic "terrorism."* [5]<br><br>Press Release, *Maryland Woman and Florida Man Charged Federally for Conspiracy to Destroy Energy Facilities*, Dep't of Just. (Feb. 6, 2023), https://perma.cc/N3PS-8XP9. |
| 2 | *The alleged plot was to occur on "U.S. soil"*<br><br>Politico Article at 2; Wray Speech at 9. | *The government alleges the attack was aimed at electrical substations in Maryland.*<br><br>Aff. in Supp. of Crim. Compl., ECF No. 14-1 at 14, 22-25 ("Affidavit"); Stip. of Facts, Clendaniel Plea Agreement, ECF No. 93 at 4-5 ("Stip. of Facts"). |
| 3 | *Against "U.S. critical infrastructure"*<br><br>Politico Article at 2; Wray Speech at 9. | *Mr. Russell is charged with conspiracy to damage an energy facility.*<br><br>Indictment, ECF No. 25. |

---

[5] Despite the very serious allegation of terrorism, the government did not charge Mr. Russell under any of the myriad terrorism statutes.

| 4 | *Alleged plot foiled in 2023*<br><br>FBI News Story at 3; Politico Article at 2 ("last year"); Wray Speech at 9 (same). | *Mr. Russell was arrested on February 3, 2023.*<br><br>Arrest Warrant, No. 23-mj-1120, ECF No. 1 (M.D. Fla. Feb. 6, 2023). |
|---|---|---|
| 5 | *By "a person located inside the U.S."*<br><br>Politico Article at 3; Wray Speech at 9. | *Mr. Russell was located in the United States at the time of the alleged events.*<br><br>Aff.; Stip. of Facts. |
| 6 | *"specific targets in the U.S." had been identified*<br><br>Politico Article at 3; Wray Speech at 9. | *The government alleges five particular electrical substations had been identified.*<br><br>Aff. ¶¶ 14, 22–25; Stip. of Facts at 4-5. |
| 7 | *"who'd done relevant research and preparation"*<br><br>FBI News Story at 3; Wray Speech at 9. | *The government alleges Mr. Russell shared written and video materials on infrastructure attacks.*<br><br>Aff. ¶¶ 8–9, 11, 23–24. |
| 8 | *"acquired the means to conduct an attack"*<br><br>Politico Article at 3; Wray Speech at 9. | *The government alleges that Mr. Russell's co-defendant acquired firearms for the attack and that firearms and ammunition were recovered from her bedroom.*<br><br>Aff. ¶¶ 17–18; Stip. of Facts at 3-5. |

14

| 9 | *"regular contact with an unspecified foreign terrorist group"*<br><br>Politico Article at 3; Wray Speech at 9 (U.S. person had "been in touch with a foreign terrorist"); FBI News Story at 3 (same). | *The government alleges that Mr. Russell was involved in a group with "international ties" and that has been designated as a "terrorist group" by U.S. allies. Based on information available to the defense, Mr. Russell appears to have been in frequent communication with individuals located abroad prior to his arrest.*<br><br>Aff. ¶¶ 4-5; U.S. State Dep't, *Country Reports on Terrorism 2022: Australia*, https://perma.cc/28MSVFNC (last visited July 27, 2024); Pub. Safety Can., *Currently Listed Entities*, https://perma.cc/R97U-P5H6 (last visited July 27, 2024); U.K. Home Off., *Proscribed Terrorist Groups or Organisations* (Apr. 26, 2024), https://perma.cc/8VC5-X453. |
|---|---|---|
| 10 | *Alleged plot was "potentially imminent"*<br><br>Politico Article at 1, 2, 5. | *The government alleges the plot involved a "time frame" or "no longer than a month."*<br><br>Aff. ¶ 14; Stip. of Facts at 3. |
| 11 | *Foiled "less than a month" after first uncovered*<br><br>Wray Speech at 9; FBI News Story at 3; Politico Article at 3 ("roughly 30 days"). | *The government alleges that it learned the particulars of the attack in January 2023 and Mr. Russell was arrested on February 3, 2023.*<br><br>Aff. ¶¶ 12–13; Stip. of Facts at 2; Press Release, *Maryland Woman Pleads Guilty to Conspiring to Destroy the Baltimore Region Power Grid*, Dep't of Justice (May 14, 2024), https://perma.cc/46GB-ZYYR (noting that the "plans began to culminate on Jan. 12, 2023"); Arrest Warrant. |

2.    Argument on the merits

The Government is required to affirm or deny its Section 702 surveillance of Appellant Russell under 18 U.S.C. § 3504, and to provide notice and disclosure of the surveillance under the Fourth and Fifth Amendments to the Constitution, 50 U.S.C. § 1806(c), and Rule 16 of the Federal Rules of Criminal Procedure.  Arguments relating to each of these provisions are addressed in turn below.

a.    The Government must affirm or deny the surveillance of Appellant Russell under 18 U.S.C. § 3504

Through 18 U.S.C. § 3504(a), Congress established the right to compel the Government to affirm or deny whether it has conducted surveillance, based on a "claim" of unlawful surveillance by an "aggrieved" party.  The statute provides:

> In any trial, hearing, or other proceeding . . . upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act[.]

18 U.S.C. § 3504(a).  "Unlawful act" is defined as "the use of any electronic, mechanical, or other device" in violation of the law. *Id.* § 3504(b).  Under the statute, the Government is expressly required to "affirm or *deny*" such surveillance.  18 U.S.C. § 3504(a) (emphasis added).

When Congress enacted FISA, it recognized that individuals in criminal cases would rely on Section 3504 to learn of the Government's use of FISA surveillance,

16

including in scenarios where the Government had not provided notice under FISA. *See* S. Rep. 95-701, 63, as reprinted in 1978 U.S.C.C.A.N. 3973, 4032 (describing use of 18 U.S.C. § 3504 in the FISA context).[6]  Because Appellant Russell satisfies each element of the statute, the Government *must* affirm or deny whether his communications were acquired pursuant to Section 702.

First, Appellant Russell "claim[s]" that evidence in this case was obtained by the exploitation of unlawful Section 702 surveillance and should be suppressed. *Id.* § 3504(a).  Such a claim "need be no more than a 'mere assertion,' provided that it is a positive statement that illegal surveillance has taken place." *United States v. Apple*, 915 F.2d 899, 905 (4th Cir. 1990) (citation omitted).  This is not a demanding requirement, due to the nature of surreptitious surveillance: "The government, not appellants, has the information which can substantiate or dissolve their contentions, and for that reason Congress expected that the burden of going forward would shift to the government." *In re Evans*, 452 F.2d 1239, 1248-1250 (D.C. Cir. 1971).  *See also United States v. Vielguth*, 502 F.2d 1257, 1259 n.4 (9th Cir. 1974) ("Requiring more than a claim may encourage the development of more secretive means of illegal surveillance, rather than encourage elimination of such unlawful intrusions.").

---

[6] As the Senate Report describes, if the Government affirms its use of FISA surveillance under 18 U.S.C § 3504, the defense may then proceed to file a motion to suppress as provided in FISA.  *See* S. Rep. 95-701, 63, *as reprinted in* 1978 U.S.C.C.A.N. 3973, 4032; 50 U.S.C. § 1806(e).

In the August 14, 2024, motion to compel, Appellant Russell affirmatively stated that the Section 702 surveillance of his communications was unlawful and that evidence in his case is inadmissible because it is the product of unlawful Section 702 surveillance or obtained by the exploitation of such surveillance. The warrantless search and seizure of his communications pursuant to Section 702 violates the Fourth Amendment's warrant requirement and is unreasonable. *See Katz v. United States*, 389 U.S. 347, 357 (1967) (searches conducted without a warrant are "*per se* unreasonable under the Fourth Amendment*"); *Berger v. New York*, 388 U.S. 41, 58 (1967) (electronic surveillance is only reasonable when the eavesdropping is "precise and discriminate" and "carefully circumscribed so as to prevent unauthorized invasions" of privacy). *See also United States v. Hasbajrami*, 945 F.3d 641, 670 (2d Cir. 2019) (holding that querying Section 702 databases is "a separate Fourth Amendment event that, in itself, must be reasonable"). Section 702 surveillance also violates Article III of the Constitution. Under Section 702, the Government asks the FISC to issue mass surveillance orders – resulting in the routine collection of Americans' communications – without any concrete factual showing. In other words, under Section 702, the FISC issues advisory opinions on broad legal questions in the absence of any "case or controversy."[7]

---

[7] Should the Government affirm the occurrence of the surveillance, Appellant Russell would then intend to fully brief the illegality of Section 702 surveillance

Section 3504 requires nothing more with respect to a "claim" that evidence is inadmissible, and the Government's obligation to affirm or deny surveillance applies irrespective of its own views on the legality of its surveillance. *E.g., In re Grand Jury Proc.*, 524 F. Supp. 87, 89 (E.D. Pa. 1981) (Government's "opinion on the legality" of surveillance irrelevant). Thus, even where the Government believes that its surveillance is lawful, it responds to Section 3504 motions by affirming or denying the fact of surveillance. *See, e.g., In re Grand Jury Subpoena (T-112)*, 597 F.3d 189, 200 (4th Cir. 2010); *In re Askin*, 47 F.3d 100, 106 n.2 (4th Cir. 1995); *United States v. D'Andrea*, 495 F.2d 1170, 1173 (3d Cir. 1974).

Second, Appellant Russell is a "party aggrieved" under the statute. As this Court has held, to make the required showing, the movant need only have a "colorable basis" to believe that he was a party to an intercepted communication. *Apple*, 915 F.2d at 905. In cases such as this one, "[w]here the government does not admit illegal wiretapping," the movant can rely on "inference[s]" to establish that "colorable showing." *Matter of Archuleta*, 434 F. Supp. 325, 327 (S.D.N.Y. 1977). *See also United States v. Carter*, No. 19-cr-819, 2020 WL 7490401, at *4 (N.D. Ill. Dec. 21, 2020) (holding that "a reasonable inference from the omission of information

---

under both the Fourth Amendment and Article III of the Constitution as part of a motion to suppress. But for purposes of Section 3504 claims, only "a positive statement that illegal surveillance has taken place" is required. *Apple*, 915 F.2d at 905.

19

in the government's disclosures" was sufficient under the statute); *United States v. Osborne*, 424 F. Supp. 70, 72 (E.D. Pa. 1976) (holding that the movant "clearly is a person aggrieved under the statute" given inferences from "clicking noises" on his phone and the police department's history of "using illegal electronic surveillance" more generally).[8]   In the instant case, relying on the specific and reasonable inferences set forth above, Appellant Russell has established more than a "colorable basis" to believe that he is aggrieved. *Apple*, 915 F.2d at 905.

Finally, for the purposes of Section 3504, the Government's views on whether its evidence is tainted are irrelevant. Because Appellant Russell has asserted that the Government's evidence in this case is the product of unlawful Section 702 surveillance, and because he has made a colorable showing that he is aggrieved, the Government "must 'affirm or deny'" the surveillance. *Apple*, 915 F.2d at 905. Only "then," after the Government's response, should a court proceed to consider taint. *Id.* at 906, 909-911 ("The district court abused its discretion when it ruled on the independent source issue before the government had adequately denied the occurrence of the alleged illegal surveillance."); *United States v. Weiner*, 418 F.

---

[8] In *Apple*, where the Government had already confirmed that a particular device was subject to surveillance, the district court required the movants to attest that they communicated via that device. *See Apple*, 915 F.2d at 907. But that step is inapplicable here because the government has not confirmed the device or account subject to surveillance.

Supp. 941, 946-947 (M.D. Pa. 1976) ("[T]he government's response should go to the existence of the unlawful activity itself, and should not be concerned with the connection such activity may have with the proceedings at issue."), *aff'd, United States v. Shinnick*, 546 F.2d 420 (3d Cir. 1976) (unpublished). Accordingly, the Government should have been required to affirm or deny the occurrence of the surveillance under Section 3504. *See Carter*, 2020 WL 7490401, at *4 ("The government must respond, under oath, and state conclusively whether it used [the surveillance] technique against Carter.").

In the district court's memorandum denying the August 14, 2024, motion to compel, the district court stated the following about Appellant Russell's Section 3504 claim:

> Under Fourth Circuit precedent applying § 3504, "a party claiming to be the victim of illegal electronic surveillance must first demonstrate that his interests were affected before the government's obligation to affirm or deny is triggered." *United States v. Apple*, 915 F.2d 899, 905 (4th Cir. 1990). To meet this requirement, a party must first make a "definite 'claim'" that they are an aggrieved person. *Id*. At this first stage, the movant need only provide the "mere assertion ... that illegal surveillance has taken place." *Id*. (quotation omitted). But, at the next stage, "the claimant must also make a prima facie showing that he was 'aggrieved' by the surveillance; that is, that he was a party to an intercepted communication, that the government's efforts were directed at him, or that the intercepted communications took place on his premises. *This critical [second] showing may not be based on mere suspicion; it must have at least a 'colorable basis.'*" *Id*. (emphasis added) (quoting *United States v. Pacella*, 622 F.2d 640, 643 (2d Cir. 1980)).
>
> The Defendant has doubtless met the first prong of the *Apple* test,

21

because he has clearly (and repeatedly) claimed that he was the victim of illegal surveillance. But the Defendant stumbles at the second prong of the *Apple* test because he fails to make a prima facie showing that he was aggrieved by government surveillance of him. As one court has observed, the facts of Apple itself suggest that the prima facie showing requirement is a somewhat "demanding" one. *In re Grand Jury Investigation*, 431 F. Supp. 2d 584, 590 (E.D. Va. 2006). In *Apple*, the court held that a defendant failed to make a prima facie showing that he was the subject of surveillance – despite the uncontroverted fact that his friend's phone, which the defendant had allegedly called, had been wiretapped – because the defendant failed to identify which specific phone calls he made to the wiretapped phone during the time period that the phone was under surveillance. 915 F.2d at 907.  Like the defendant in *Apple*, here the Defendant has failed to make a prima facie showing because his claim rests on suspicion and unsubstantiated allegations.

Notably, beyond his general allegations that he was subject to FISA surveillance, the Defendant has not pointed to a *single* conversation, document, or other material that he alleges was unlawfully surveilled. Instead, the Defendant relies entirely on out-of-court statements by Department of Justice officials and a *Politico* article that he believes prove that he was the subject of surveillance under FISA § 702.  This supposed proof consists of fairly generic statements strung together from a speech by FBI Director Christopher Wray, an FBI press release about that speech, and statements in a *Politico* article attributed to an unnamed FBI official. (*See* ECF No. 146 at 13.) The Defendant lists various similarities between the public statements and the facts of this case. (*See id.* at 14-15 (listing similarities between the public statements and this case, such as the fact that this was an alleged terror plot against critical United States infrastructure by a United States person in 2023).)  However, the alleged thwarted attack referenced in those statements, while *consistent* with the facts of this case, is not so closely tied to the facts of this case as to make any connection between those statements and this case more than speculative.

The Court accepts Defense Counsel's representation that they searched all public criminal dockets and found no other case that corresponds to the facts of the public statements other than the case at bar. The problem is that this representation simply does not get the Defendant very far. Neither the Court nor the Defendant know or have

22

any way of knowing how many nonpublic matters might also correspond to the public statements at issue. Some cases could be under seal in whole or in part, others might still be in investigative stages, and others still might not have led to criminal charges at all. In highly sensitive domestic terrorism cases, it is all the more likely that the statements could be referring to information that is classified or otherwise secret. As the Court previously put it during the June 27, 2024, motions hearing, "so much of what goes on in this context is ... behind the veil of secrecy." (ECF No. 138 at 38.) In fact, counsel for the Defendant conceded at that hearing that it is "unknown" how often the Government has used FISA in cases similar to this one. (*Id*. at 36.)

Under these circumstances, the Defendant has failed to meet his burden of making a prima facie showing sufficient to require the Government's affirmance or denial of surveillance under 18 U.S.C. § 3504. *See United States v. Nicka*, Crim. No. RWT-10-0777, 2013 WL 12187497, at *2 (D. Md. Oct. 15, 2017) (holding that defendants failed to make a prima facie showing that they were the subject of unlawful surveillance when they alleged, but failed to make a sufficient showing, that a prosecutor had intercepted a phone conversation between defense co-counsel). "Put simply, bare allegations that the government has been intercepting communications through illegal electronic surveillance will not trigger the requirement that the government affirm or deny those allegations." *In re Grand Jury*, 431 F. Supp. 2d at 591. The Court recognizes that the Defendant is in the difficult position of trying to prove "conduct which is by its nature secret," but "it is also true that unsubstantiated allegations are too easily made to justify the expense and delay which would result from requiring the government to dispel every allegation, no matter how frivolous." *Id*. (quotation omitted); *see also United States v. Al-Timini*, Crim. No. LMB-04-0385, 2014 WL 12957760, at *5 (E.D. Va. Apr. 28, 2014) (denying a defendant's post-conviction motion to compel FISA discovery when his "request rest[ed] heavily on plausible-sounding speculation" and when he failed to "describe the evidence sought with any particularity").

For these reasons, the Court will not require the Government to affirm or deny the existence of FISA surveillance under 18 U.S.C. § 3504.

(JA259-262) (footnote omitted). The district court erred by concluding that Appellant

23

Russell has not shown a "colorable basis" sufficient to trigger Section 3504. The district court ignored the extensive case law cited by Appellant Russell, which unequivocally shows that a movant can rely on factual inferences to establish a colorable showing. *See Archuleta*, 434 F. Supp. at 327; *Carter*, No. 19-cr-819, 2020 WL 7490401, at *4; *Osborne*, 424 F. Supp. at 72. Appellant Russell's allegations are *not* "speculative," "bare," or "unsubstantiated"; rather, Appellant Russell's claim is based on reasonable inferences analogous to those in the cited cases. For example, in *Osborne*, the court found that the movant "clearly" was a "party aggrieved" under the statute given inferences from amorphous "clicking noises" on his phone and the police department's history of using illegal electronic surveillance more generally. *Osborne*, 424 F. Supp. at 70, 72. Here, Appellant Russell's claim is based on *eleven specific facts* in the FBI's disclosures about its use of warrantless Section 702 queries, and the fact that no other public prosecution contains allegations consistent with the FBI's statements. The eleven facts in the FBI's disclosures *map precisely onto this case* and *only this case*. That is a far cry from "pure speculation."

Appellant Russell's showing is far more substantial than the "bare allegations" rejected by other courts. For example, in *In re Grand Jury Investigation*, 431 F. Supp. 2d 584, 591 (E.D. Va. 2006), the court held that general allegations about the existence of an NSA surveillance program and a movant's bare assertion that she was

24

targeted were insufficient to show that the movants were aggrieved. *Id.* Similarly, in *United States v. James*, 609 F.2d 36, 51 (2d Cir. 1979), the accused's only support for the existence of surveillance was the fact that a particular police unit participated in the investigation. *James*, 609 F.2d at 51. The accused provided no information as to why the presence of that unit made unlawful surveillance more likely. In contrast to both of these cases, here Appellant Russell is not merely relying on the fact that the FBI engages in Section 702 surveillance or baldly claiming that he is a target; instead, he has made a specific, colorable showing based on *particular facts in the FBI's disclosures and the absence of those allegations in other public prosecutions*.

Accordingly, contrary to the district court's conclusion, Appellant Russell is, in fact, a "party aggrieved" under Section 3504 (i.e., Appellant Russell has established more than a "colorable basis" to believe that he is aggrieved). It follows that the district court should have required the Government to affirm or deny the existence of FISA surveillance under Section 3504. Consistent with this Court's holding in *Apple*, Appellant Russell's judgment "must be vacated and remanded for further proceedings under 18 U.S.C. § 3504(a)(1)." *Apple*, 915 F.2d at 911.

     b.     <u>Due process entitles Appellant Russell to notice of the Section 702 surveillance and disclosure of his intercepted communications</u>

Due process independently entitles Appellant Russell to notice of the Government's Section 702 surveillance and disclosure of his intercepted

communications. The D.C. Circuit has expressly held that "even when the Government has not purported to be offering any evidence obtained or derived from [FISA] surveillance" for the purposes of Section 1806(c), the accused may still pursue an "[a]lternative[]" path to litigate FISA surveillance. *Belfield*, 692 F.2d at 146. Specifically, as a matter of due process, the accused may "seek discovery of the logs of the overhears to ensure that no fruits thereof are being used against him." *Id.* at 146 & n.22 (citing *United States v. Alderman*, 394 U.S. 165 (1969)). In reaching this holding, the D.C. Circuit recognized that notice and disclosure of FISA surveillance is essential to the accused's due process rights. Accordingly, Appellant Russell is entitled to notice and disclosure of any of his communications acquired or accessed by the FBI in the course of its investigation pursuant to Section 702.

Due process requires the government to provide Appellant Russell with notice and disclosure. Both are indispensable to bringing an informed motion to suppress. Without notice, Appellant Russell cannot test whether the Government's evidence was lawfully obtained or whether it was acquired in violation of the Fourth Amendment. Because notice is relevant and would have been helpful to a motion to suppress, due process requires notice here. Similarly, without disclosure, Appellant Russell was denied the opportunity to fairly litigate any Government claim that its evidence was not the product of Section 702 surveillance, as the Supreme Court held

26

in *Alderman*, 394 U.S. at 180-185.

Under the Fourth Amendment and the Due Process Clause of the Fifth Amendment, the accused must have a meaningful opportunity to pursue suppression of illegally acquired evidence. *See Murray v. United States*, 487 U.S. 533, 536-538 (1988) (describing right to seek suppression). Notice of surveillance is an obvious precondition to an informed motion to suppress. *See United States v. Moalin*, 973 F.3d 977, 1000 (9th Cir. 2020) ("[C]riminal defendants who have no knowledge that a potentially unconstitutional search has played a part in the government's case against them have no opportunity to vindicate any Fourth Amendment-protected rights through suppression."); *United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) ("The suppression of material evidence helpful to the accused, whether at trial or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."); *Smith v. Black*, 904 F.2d 950, 965-966 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992) (due process mandates the disclosure of information in the government's possession if nondisclosure would "affect[ ] the outcome of [a] suppression hearing").

In light of these bedrock principles, courts have long held that notice is a constitutionally required element of surreptitious searches like wiretaps and

27

sneak-and-peek entries.  *See Berger*, 388 U.S. at 60 (finding wiretapping statute unconstitutional because, among other things, it had "no requirement for notice"); *Dalia v. United States*, 441 U.S. 238, 247-248 (1979) (Title III provides "a *constitutionally adequate* substitute for advance notice" by requiring notice after the surveillance is completed) (emphasis added); *United States v. Freitas*, 800 F.2d 1451, 1456 (9th Cir. 1986) (finding sneak-and-peek warrant constitutionally defective for its failure to provide notice within a reasonable time).  In none of these cases did the courts suggest that the Government may withhold notice on the theory that its trial evidence was not legally tainted.  Rather, courts recognize that notice serves a constitutionally significant function in the context of secret surveillance – because, without notice, the accused would be deprived of a meaningful opportunity to seek suppression.

Due process also requires notice because it is "relevant and helpful" to the defense, even if the information is classified or subject to a government privilege. *See Roviaro v. United States*, 353 U.S. 53, 60-62 (1957); *United States v. Moussaoui*, 382 F.3d 453, 471-472 (4th Cir. 2004) ("[A] defendant becomes entitled to disclosure of classified information upon a showing that the information 'is relevant and helpful to the defense.'") (citation omitted); *Jencks v. United States*, 353 U.S. 657, 671 (1957) (the Government cannot invoke its privileges to "deprive the accused of

28

anything which might be material to his defense"). In other words, due process entitles the accused to information – like the fact that Appellant Russell was subject to Section 702 surveillance – that is relevant and helpful to their arguments that evidence was obtained illegally and should be suppressed. *Roviaro*, 353 U.S. at 60-62. *See also United States v. Aref*, 533 F.3d 72, 80 (2d Cir. 2008) ("To be helpful or material to the defense, evidence need not rise to the level that would trigger the Government's obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose exculpatory information."); *United States v. Amawi*, 695 F.3d 457, 471 (6th Cir. 2012) (same); *United States v. Mejia*, 448 F.3d 436, 456-457 (D.C. Cir. 2006) (same).

Thus, due process requires notice where, as here, the Government has used a surveillance tool against a defendant, and the Government's evidence is plausibly derived from that surveillance as a factual matter. It would never be appropriate for the Government to withhold notice based on its theory that the exclusionary rule might not apply down the line. *See United States v. Leon*, 468 U.S. 897, 906 (1984) (Fourth Amendment violations and the exclusionary rule must be analyzed separately). The question of whether the Government violated Appellant Russell's Fourth Amendment rights comes first. Notice is essential to fairly litigating that question.

Alongside notice of the surveillance, due process entitles Appellant Russell to disclosure of his communications that the FBI acquired or accessed in its

29

investigation under Section 702. As the D.C. Circuit recognized in *Belfield*, disclosure of those communications is essential because, without that, the defense cannot fairly assess and litigate a closely related suppression issue: whether the Government's evidence is a product of the surveillance. *Belfield*, 692 F.2d at 146. Indeed, *Belfield* recognized that even in scenarios where the Government has not provided statutory notice of FISA surveillance, the accused could learn of the surveillance by demanding disclosure of their intercepted communications and seeking to litigate whether the "fruits" of that surveillance were being used in the prosecution, 692 F.2d at 146 & n.22, just as the Supreme Court prescribed in *Alderman*, 394 U.S. at 169.

*Alderman* was a watershed decision for criminal prosecutions involving surreptitious electronic surveillance, including those implicating "information relating to the national defense of the United States." 394 U.S. at 169. There, the Government had proposed litigating Fourth Amendment taint issues by submitting surveillance records to the trial judge for in camera inspection, who would then disclose any records "arguably relevant" to petitioners' convictions. *Id.* at 181. But the Supreme Court rejected that proposal, holding that "surveillance records as to which any petitioner has standing to object should be turned over to him" – regardless of whether the district court deemed them "arguably relevant" to the Government's

30

showing at trial. *Id.* at 182.

The core insight of *Alderman* was that electronic surveillance yields vast amounts of private information, which agents rely on in a variety of ways to further an investigation. Because of this complexity, only an adversarial process can ensure that courts accurately resolve the legal and factual questions of whether the Government's evidence is the "fruit" of its surveillance. As the Court explained, "in our view the task is too complex, and the margin for error too great, to rely wholly on the in camera judgment of the trial court." *Id.* at 182 & n.14. Instead, to avoid leaving the trial court and defendants entirely reliant on the Government's one-sided claims, adversarial proceedings are necessary "to provide the scrutiny which the Fourth Amendment exclusionary rule demands." *Id.* at 184. *See also United States v. U.S. Dist. Court (Keith)*, 407 U.S. 297, 324 (1972) (ordering disclosure of wiretaps in national security case to facilitate adversarial litigation under *Alderman*); *Apple*, 915 F.2d at 910 ("To compel a party who objects to the use of evidence obtained as a result of unlawful wiretapping to go forward with a showing of taint, and then to withhold from him the means or tools to meet that burden, is to create an absurdity in the law.").

Critically, given the many forms of electronic surveillance used today, it is not enough for the Government to disclose Appellant Russell's communications without also providing specific notice of how they were obtained. In some cases, the

31

Government may obtain the same communications multiple ways – for example, first through Section 702 surveillance and then subsequently through a Stored Communications Act warrant. *See* 18 U.S.C. § 2703(b). This practice, often called "parallel construction," is used at times to conceal the use of novel or unlawful surveillance techniques in criminal proceedings, making it appear that a person's communications were obtained solely through ordinary, uncontroversial legal process.[9] But under the due process principles described above, the Government cannot withhold notice of the specific techniques it used – precisely because that information is essential to an informed motion to suppress and to fairly litigating the question of whether the Government's evidence is the "fruit" of novel or unlawful surveillance methods.

   c.      Appellant Russell is entitled to notice under 50 U.S.C. § 1806(c)

In the August 14, 2024, motion to compel, Appellant Russell renewed his motion for notice under 50 U.S.C. § 1806(c) to address points in the district court's decision and memorandum (JA145 & JA158). Section 1806(c) of FISA provides: "Whenever the Government intends to enter into evidence or otherwise use or disclose" in "any . . . proceeding . . . against an aggrieved person, any information

---

[9] Human Rights Watch, *Dark Side: Secret Origins of Evidence in U.S. Criminal Cases* (Jan. 9, 2018), https://perma.cc/YWW2-3KRW.

obtained or derived from an electronic surveillance of that aggrieved person pursuant to [Section 702], the Government shall . . . notify the aggrieved person and the court[.]" 50 U.S.C. § 1806(c). *See id*. § 1881e(a) (applying Section 1806 to Section 702 surveillance).

The Supreme Court has recognized that notice of Section 702 surveillance in criminal cases is essential to ensuring judicial review of this warrantless surveillance. In *Clapper v. Amnesty International USA*, the Supreme Court held that although the plaintiffs lacked standing, Section 702 was not insulated from judicial review in part because "if the Government intends to use or disclose information obtained or derived from a [Section 702] acquisition in judicial or administrative proceedings, it *must* provide advance notice of its intent, and the affected person may challenge the lawfulness of the acquisition." 568 U.S. 398, 421 (2013) (emphasis added).

Critically, as explained above, the FBI claimed that it learned of the alleged plot and was able to intervene only because of the warrantless searches of its Section 702 databases. If Appellant Russell is indeed "aggrieved," the FBI's public disclosures provide a clear basis for notice under Section 1806(c). It would make a mockery of the notice requirement to allow the Government to publicly proclaim that Section 702 surveillance was integral to this case, while simultaneously arguing to the district court that its evidence is not "derived from" Section 702.

33

(i).    <u>The Government's evidence is derived from Section 702 surveillance of Appellant Russell's communications</u>

Although the Government's response to Appellant Russell's first motion for notice cited "five criteria" that must be met under Section 1806(c), the proper analysis boils down to two questions: whether Appellant Russell was subject to Section 702 surveillance, and whether the Government intended to use "information obtained or derived from" that surveillance of Appellant Russell.  The FBI's disclosures make plain that the answer to both questions is yes.

As courts have long held, evidence is "derived" from surveillance whenever it is the direct or indirect product of that surveillance, including where there are intervening investigative steps.  *See Wong Sun v. United States*, 371 U.S. 471, 484-489 (1963); *United States v. Seidman*, 156 F.3d 542, 548 (4th Cir. 1998). Additionally, evidence is derived from surveillance when the result of that surveillance "tends to significantly direct the investigation to the evidence in question."  *United States v. Gorman*, 859 F.3d 706, 716 (9th Cir. 2017) (quoting *United States v. Johns*, 891 F.2d 243, 245 (9th Cir. 1989)).

Here, the FBI's disclosures make clear that the Government's evidence is a product of Section 702 surveillance and that the collection and querying of Appellant Russell's communications significantly directed the investigation.  First, the disclosures are emphatic that, in officials' view, Section 702 surveillance was what

34

"thwarted" or "foil[ed]" the alleged plot in the first place. *See* Politico Article at 1, 2 (making this point three separate times). Second, the FBI claimed that its use of Section 702 is what revealed crucial details about the alleged attack. *See* Wray Speech at 9 ("Only by querying that U.S. person's identifiers in our 702 collection did we find important intelligence on the seriousness and urgency of the threat."); Politico Article at 5 ("the searches were what revealed an attack was imminent in the first place"); *id.* at 3 ("[T]he ability to search the Section 702 database without a court order showed that a person located inside the U.S. was in regular contact with an unspecified foreign terrorist group, had acquired the means to conduct an attack and had already identified specific targets in the U.S."). Third, the FBI asserted that it "almost definitely could not have recreated its success" without this type of surveillance. *Id.* at 4. And fourth, the FBI Director stated that the query of the Section 702 databases saved "valuable time," which was "needed to get ahead of the potential attack." Wray Speech at 9; Politico Article at 5 (using almost verbatim language).

Taken together, these factors show that central elements of the alleged plot were first discovered through Section 702 surveillance. As a result, there is little doubt that the evidence that the Government used at trial must have – at least in part – been a product of the Section 702 surveillance and that it "significantly directed"

35

the investigation.  That is enough to trigger the Government's notice obligation under Section 1806(c).

### (ii).  FISA's notice provision does not permit the Government to secretly resolve suppression issues in its own favor

Based on the public record, the Government appears to have relied on an unduly narrow interpretation of "derived from" in 50 U.S.C. § 1806(c) to withhold notice of Section 702 surveillance. Indeed, the Government has a long history of asserting that it need not provide notice of FISA surveillance to the accused when, in its view, the accused would not prevail on a motion to suppress.[10]  But this argument wrongly conflates two distinct doctrinal issues: the standard for notice and the standard for suppression.

While it is true that Section 1806(c) uses the term "derived from," and some suppression decisions consider whether evidence is "derived from" a tainted source,

---

[10] In 2013, the New York Times revealed that the Department of Justice ("DOJ") had "long used a narrow understanding of what 'derived from' means" to avoid giving notice of Section 702 surveillance in criminal cases.  Charlie Savage, *Door May Open for Challenge to Secret Wiretaps*, N.Y. Times, Oct. 16, 2013, https://nyti.ms/36ccH0G.  Although DOJ later modified its notice policy and gave notice to eleven people from 2013 to 2018, no criminal defendant has received notice of Section 702 surveillance since then.  Sarah Taitz & Patrick Toomey, *Concealing Surveillance: The Government's Disappearing Section 702 Notices*, Just Security (Sept. 27, 2023), https://perma.cc/WCR8-QBLJ.  This lack of notice is striking given that FBI agents have searched through Section 702 databases for Americans' communications millions of times over the same period, including in ordinary law enforcement investigations.  *See* PCLOB Report at 98.

the two standards are not interchangeable. In the context of a motion to suppress, "derived from" has a narrower meaning, because it does not merely ask whether evidence flowed from a tainted source as a factual matter. Rather, in the suppression context, "derived from" is a legal term of art that incorporates several doctrinal exceptions alongside the factual analysis of taint. *See, e.g., Nix v. Williams*, 467 U.S. 431, 441–446 (1984). Thus, at the suppression stage, even when unlawful surveillance appears to have been a cause or source of the Government's evidence, the Government may argue that the evidence is not "derived from" the surveillance because, for example, the evidence is too attenuated from the surveillance, it obtained the evidence from an independent source, or it inevitably would have discovered the evidence.

But these exceptions to the "fruit of the poisonous tree" doctrine are entirely irrelevant to the analysis of whether notice is required. For three key reasons, Section 1806(c) does not incorporate exceptions to the exclusionary rule, and the Government is wrong to argue otherwise.

First, the Government's argument would allow it to improperly thwart suppression litigation altogether, because notice is a precondition to an informed motion to suppress. Suppression litigation ordinarily proceeds in three phases: (1) a preliminary phase where the Government provides notice to the accused; (2)

37

adversarial litigation over the legality of the surveillance; and (3) if the surveillance is held unlawful, adversarial litigation over which evidence must be suppressed as tainted fruit of the surveillance. *See* 18 U.S.C. § 2518; 50 U.S.C. § 1806. *But without notice, the accused would typically never realize that he was subject to secret FISA surveillance, and thus he would have no basis for knowing that he should exercise his constitutional right to seek suppression.* This is why, as discussed above, Section II, courts have long held that notice is a constitutionally required element of surreptitious searches. If the legal standard for *providing notice* under Section 1806(c) were the same as the standard for assessing *whether evidence should be suppressed*, it would give the Government far too much power to decide unilaterally that an exception to the fruit-of-the-poisonous-tree doctrine applies – short-circuiting both the accused's due process right to seek suppression and the court's suppression analysis.

The Government's approach is also a problem for a practical reason: it is routinely wrong about whether evidence should be suppressed. With the benefit of adversarial litigation, courts often reject the Government's arguments about whether its evidence is "derived from" a given search or surveillance at the suppression stage. *See, e.g., Wong Sun*, 371 U.S. at 485-487; *United States v. Gaines*, 668 F.3d 170, 176 (4th Cir. 2012) (rejecting Government's argument that an exception to

38

fruit-of-the-poisonous tree doctrine applied); *United States v. Lundin*, 817 F.3d 1151, 1161-1162 (9th Cir. 2016) (same); *Johns*, 891 F.2d at 245-246 (same); *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989) (same); *United States v. Williams*, 615 F.3d 657, 671 (6th Cir. 2010) (same). *See also Kolod v. United States*, 390 U.S. 136 (1968) (*per curiam*) (rejecting the Government's unilateral determination that evidence was not derived from challenged surveillance and requiring adversarial proceedings).

Second, and relatedly, the question of whether the Government's evidence is factually "derived from" Section 702 surveillance is distinct from the question of whether the Government's evidence is legally tainted and should be suppressed. Indeed, this Court has recognized precisely this point, observing that "not all evidence conceivably derived from an illegal search need be suppressed if it is somehow attenuated enough from the violation to dissipate the taint." *United States v. Najjar*, 300 F.3d 466, 477 (4th Cir. 2002). Put differently, "derived from" is not synonymous with "legally tainted." *See also Johns*, 891 F.2d at 244 (recognizing that suppression turns on "whether evidence deriving from an illegal search is sufficiently tainted to require suppression"). Given the constitutional function of notice as a prerequisite to suppression litigation, "derived from" in Section 1806(c) must be read to focus on the factual relationship between surveillance and the Government's

39

evidence – without incorporating doctrinal exceptions to the fruit-of-the-poisonous-tree doctrine.  It must be read to encompass plausible claims that, as a factual matter, the Government's evidence was the direct or indirect product of Section 702 surveillance.

Third, for reasons explained above, the Government's argument runs afoul of the Supreme Court's decision in *Alderman*, which held that litigation over whether the Government's evidence is legally tainted must be adversarial.  394 U.S. at 180-185.  The Government cannot determine in secret or litigate *ex parte* the question of whether its evidence is fruit of the poisonous tree.

Thus, in order for Appellant Russell to have sought an informed motion to suppress, the meaning of "derived from" for the purpose of notice must be broader than what is "derived from" Section 702 for the purpose of litigating taint and suppression.  If the meaning of the two terms were identical, the "notice" and "taint" analyses would essentially collapse into one, leaving the accused entirely reliant on the Government's self-serving analysis of taint and thwarting the accused's due process rights, as explained in *Alderman*.

(iii).   Applying the canon of constitutional avoidance, Section 1806(c) must be interpreted to require notice here

Even if the Court were to conclude that "derived from" in Section 1806(c) is ambiguous, and that any narrow interpretation advanced by the Government is also

a plausible one, the canon of constitutional avoidance requires the Court to construe "derived from" more broadly to compel notice here. Where a court is "choosing between competing plausible interpretations of a statutory text," it must seek "to avoid the decision of constitutional questions." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). Because the Government apparently views Section 1806(c) as the only source of its notice obligation, its crabbed interpretation of the statute raises serious constitutional questions, as it deprived Appellant Russell of his due process rights to bring an informed motion to suppress and to litigate taint issues in an adversarial setting. Thus, to avoid adjudicating precisely what due process requires, the Court should interpret "derived from" in Section 1806(c) to require notice where, as here, it is plausible that some of the Government's evidence would not exist but for Section 702 surveillance of Appellant Russell.[11]

d. <u>Rule 16 of the Federal Rules further requires the Government to provide notice</u>

Rule 16 of the Federal Rules of Criminal Procedure also compels the Government to provide Appellant Russell with notice and disclosure of his recorded

---

[11] Notice in this context is typically a barebones, boilerplate statement that acknowledges the surveillance of the accused. *See, e.g., United States v. Khan*, No. 12-cr-659, ECF No. 59 (D. Or. Apr. 3, 2014) (Section 702 notice). Nothing prevents the Government from including in the notice an express reservation of its rights as to the "derived" analysis when litigating taint at the suppression stage of the proceedings.

41

statements.  Under Rule 16(a)(1)(E), Appellant Russell is entitled to information "material to preparing the defense."  Because notice of the Government's use of Section 702 was germane to Appellant Russell's ability to file an informed motion to suppress, this information is plainly "material" under the rule.  *See United States v. Soto-Zuniga*, 837 F.3d 992, 1000 (9th Cir. 2016) (holding that Rule 16(a)(1)(E) applies to discovery "related to the constitutionality of a search or seizure").  *See also* 2 Fed. Prac. & Proc. Crim. § 254 (4th ed.) ("Too much should not be required in showing materiality."); *United States v. Caro*, 597 F.3d 608, 620 (4th Cir. 2010) ("Rule 16 . . . is broader than *Brady*.").  Moreover, under Rule 16(a)(1)(B), Appellant Russell is expressly entitled to discovery of his "recorded statement[s]," which include any intercepted communications to which he was a party.  He is also entitled to such statements because they are items "obtained from or belong[ing] to" him under Rule 16(a)(1)(E).

e.    The district court should have unsealed the Government's *ex parte* submissions and the *ex parte* report

In the August 14, 2024, motion to compel, Appellant Russell argued that the district court should unseal the portions of the Government's *ex parte* submissions and the *ex parte* report that related to the acquisition, querying, or accessing of Appellant Russell's communications, including any factual or legal analysis.  *See* (JA158) (describing *ex parte* submissions and report).  In making this request,

42

Appellant Russell did not seek access to information about the surveillance of communications to which he was not a party.

Appellant Russell recognizes that he consented to an *ex parte* conference to facilitate the district court's understanding of the surveillance at issue, prior to further proceedings on FISA-related issues. *See* (JA156) ("Defendant did not object to this proposal."). But Appellant Russell did *not* consent to any *ex parte* briefing of intertwined factual and legal issues, and he *expressly contested* any *ex parte* determination of "whether any evidence 'obtained or derived from' any electronic surveillance pursuant to § 702 contributed to the Government's investigation or prosecution of him." *Id.* See also (JA040) (contesting that such determinations can be made on an *ex parte* basis); (JA067-068, JA075-077). To the extent any of the materials submitted to the district court or created as a result of the *ex parte* conference describe the Government's acquisition, querying, or accessing of Appellant Russell's communications – or address related legal issues – Appellant Russell opposed the continued withholding of such records from the defense.

Notably, the Government did not present any basis to justify the withholding of those materials from Appellant Russell. The Government did not formally move to seal those portions of the record. Moreover, although the Government has apparently claimed that some of the information is classified, the Government did not

43

invoke the provisions of FISA or the Classified Information Procedures Act, 18 U.S.C. App. III ("CIPA"), in this case. Outside of those statutory frameworks, there is no free-floating entitlement to withhold classified information submitted to the court in a criminal proceeding, given the due process and fair trial rights of the accused. *See* 2 David Kris & J. Douglas Wilson, National Security Investigations and Prosecutions § 26:5 (3d ed. 2019, rev. 2023) (observing that, "[s]tanding alone, the fact that information is classified does not excuse the government from producing it in discovery," and explaining that the government can declassify the information at issue or file motions under authorities like CIPA).

Furthermore, it is far from clear that all the information under seal is as sensitive as the Government claims. If Appellant Russell was not the person FBI Director Wray publicly described in his remarks, that fact is not properly classified. Conversely, if Appellant Russell was the person described by the FBI, and FBI Director Wray could disclose detailed information about how the FBI used Section 702 at an ABA luncheon, there is no reason the Government could not disclose comparable information to the defense in this case. The Court should scrutinize the Government's claims about what it seeks to withhold, and should assess whether it can be properly withheld in the face of Appellant Russell's discovery and due process rights.

Appellant Russell is entitled to the *ex parte* materials that relate to the

44

acquisition, querying, or accessing of his communications. As discussed above, under Rule 16, Appellant Russell is entitled to discovery of his "recorded statement[s]" and items "obtained from or belong[ing] to him." *See* Fed. R. Crim. P. 16(a)(1)(B), 16(a)(1)(E). The materials should have also been disclosed because they are "relevant and helpful" to the defense, even if the information is classified or subject to a Government privilege. *See Moussaoui*, 382 F.3d at 471-472 ("[A] defendant becomes entitled to disclosure of classified information upon a showing that the information 'is relevant and helpful to the defense.'") (citation omitted). *See also Roviaro*, 353 U.S. at 60-62; Fed. R. Crim. P. 16(a)(1)(E) (requiring disclosure of information "material to preparing the defense").

Additionally, in criminal proceedings, an adversarial process is of paramount importance to the accused's due process and fair trial rights. *See Strickland v. Washington*, 466 U.S. 668, 685 (1984) ("[A] fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding."); *Alderman*, 394 U.S. at 168, 182, 182 n.14, 184 (emphasizing the difficult judgments raised by "cases involving electronic surveillance," and holding that "in our view the task is too complex, and the margin for error too great, to rely wholly on the in camera judgment of the trial court"). *Cf. In re Grand Jury Matter*, 683 F.2d at 69 (holding that an *ex parte* procedure is a

45

"procedurally deficient" way to resolve an 18 U.S.C. § 3504 motion). To the extent the *ex parte* materials include factual or legal analysis about the role of surveillance in this case, Appellant Russell has not had any opportunity to address those specific claims. Providing him with those materials facilitates the adversarial process the Constitution requires.

The Government's conclusory assertion that the information is classified does not override Appellant Russell's due process, fair trial, and discovery rights. The district court should have unsealed the portions of the records from the *ex parte* conference that relate – either factually or legally – to the surveillance of Appellant Russell's communications.

\* \* \* \* \* \*

Accordingly, for all of the reasons set forth above, the district court erred by denying Appellant Russell's August 14, 2024, (1) motion to compel the Government to provide notice of its Section 702 surveillance of his communications or otherwise affirm or deny the surveillance; (2) motion to compel the Government to disclose all of Appellant Russell's communications that were the product of such surveillance; and (3) request that the court unseal the portions of the materials and report from the July 23, 2024, *ex parte* conference that relate to the Government's Section 702 surveillance of Appellant Russell. The Court should vacate Appellant Russell's judgment and remand this case for further proceedings. *See Apple*, 915 F.2d at 911.

## I. CONCLUSION

The appropriate remedy is to vacate Appellant Russell's judgment and to remand this case for further proceedings.

## J.  REQUEST FOR ORAL ARGUMENT

The issue in this case concerns whether the district court erred by denying Appellant Russell's motion to compel the Government to affirm or deny the surveillance of Appellant Russell under 18 U.S.C. § 3504 – and specifically whether Appellant Russell is a "party aggrieved" under Section 3504 (i.e., whether Appellant Russell established a "colorable basis" to believe that he is aggrieved).  Resolution of this issue turns on whether Appellant Russell's allegations – which were based on *eleven specific facts* in the FBI's disclosures about its use of warrantless Section 702 queries – are merely "speculative," "bare," or "unsubstantiated."  Contrary to the district court's conclusion, Appellant Russell submits that he has made a specific, colorable showing based on reasonable inferences: the particular facts in the FBI's disclosures and the absence of those allegations in other public prosecutions.  This Court should grant oral argument to consider this important issue.

Respectfully submitted,

/s/ Michael Ufferman
MICHAEL UFFERMAN
Michael Ufferman Law Firm, P.A.
2022-1 Raymond Diehl Road
Tallahassee, Florida 32308
(850) 386-2345
FL Bar No. 114227
Email: ufferman@uffermanlaw.com

Counsel for Appellant **RUSSELL**

48

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. __25-4438__        **Caption:** United States of America v. Brandon Russell

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains ____11,419____ [*state number of*] words

☐ this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using
Word Perfect X9 _____ [*identify word processing program*] in
Times New Roman regular 14-point __ [*identify font, size, and type style*];

**or**

☐ this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) Michael Ufferman _____

Party Name Appellant Brandon Russell _____        Date: 1/6/2026 _____

12/09/2024  NA/MEO