# No. 25-4438

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

BRANDON CLINT RUSSELL,

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the District of Maryland,
(Hon. James K. Bredar, No. 1:23-cr-56)

———————————

BRIEF FOR THE UNITED STATES

———————————

KELLY O. HAYES
United States Attorney
for the District of Maryland

DAVID C. BORNSTEIN
Assistant United States Attorney
Chief, Appellate Division
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, MD 21201

JOHN A. EISENBERG
Assistant Attorney General
National Security Division

GARRETT COYLE
Attorney, Appellate Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20005
(202) 598-2929
garrett.coyle@usdoj.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................ 1

JURISDICTIONAL STATEMENT ....................................................3

ISSUES PRESENTED ......................................................................3

RELEVANT STATUTORY PROVISIONS .........................................4

STATEMENT .................................................................................5

    A.    Russell devises a plan to destroy electrical grid
infrastructure in Maryland.....................................................5

    B.    District court proceedings.....................................................8

SUMMARY OF ARGUMENT ..........................................................14

ARGUMENT ...............................................................................16

I.    RUSSELL WAS NOT ENTITLED TO THE REQUESTED
INFORMATION ABOUT FISA SECTION 702
SURVEILLANCE.......................................................................16

    A.    Russell was not entitled to notice under
50 U.S.C. § 1806(c) ..............................................................17

    B.    Russell was not entitled to notice under
18 U.S.C. § 3504 ..................................................................20

        1.    Section 3504 does not apply to FISA surveillance ......21

        2.    In any event, Russell failed to make the necessary
showing that he was aggrieved under § 3504 ............26

    C.    Russell was not entitled to notice under
the Due Process Clause.........................................................28

    D.    Russell was not entitled to notice under
Rule 16..................................................................................33

II.    REGARDLESS, ANY ERROR WAS HARMLESS .......................34

III.    RUSSELL WAS NOT ENTITLED TO THE SEALED
CLASSIFIED RECORD ...............................................................36

CONCLUSION ................................................................................38

ii

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Alderman v. United States,*
   394 U.S. 165 (1969)................................................................. 31, 32

*Brady v. Maryland,*
   373 U.S. 83 (1963)....................................................................29

*Clapper v. Amnesty International USA,*
   568 U.S. 398 (2013)................................................................. 17, 18

*FBI v. Fazaga,*
   595 U.S. 344 (2022)................................................................. 21, 22

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000)....................................................................23

*Franks v. Delaware,*
   438 U.S. 154 (1978)....................................................................11

*Gelbard v. United States,*
   408 U.S. 41 (1972)....................................................................21

*In re Grand Jury Investigation,*
   431 F. Supp. 2d 584 (E.D. Va. 2006) ...............................................26

*In re Grand Jury Subpoena (T-112),*
   597 F.3d 189 (4th Cir. 2010)..................................................... 22, 25

*In re Sealed Case,*
   310 F.3d 717 (F.I.S.C.R. 2002) .......................................................18

*Matter of Archuleta,*
   434 F. Supp. 325 (S.D.N.Y. 1977)....................................................28

*Neder v. United States,*
   527 U.S. 1 (1999)................................................................. 35, 36

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
   566 U.S. 639 (2012)....................................................................23

iii

*United States v. Abu-Jihaad,*
  630 F.3d 102 (2d Cir. 2010) ............................................................... 31

*United States v. Apple,*
  915 F.2d 899 (4th Cir. 1990) ................................................. 21, 26, 27

*United States v. Aziz,*
  228 F. Supp. 3d 363 (M.D. Pa. 2017) ................................................ 24

*United States v. Belfield,*
  692 F.2d 141 (D.C. Cir. 1982) ...................................................... 31–33

*United States v. Caro,*
  597 F.3d 608 (4th Cir. 2010) ................................................. 29, 33, 34

*United States v. Carter,*
  No. 19-cr-819, 2020 WL 7490401 (N.D. Ill. Dec. 21, 2020) ................ 28

*United States v. Day,*
  700 F.3d 713 (4th Cir. 2012) ............................................................. 37

*United States v. Dhirane,*
  896 F.3d 295 (4th Cir. 2018) ....................................................... 31, 37

*United States v. El-Mezain,*
  664 F.3d 467 (5th Cir. 2011) ............................................................. 31

*United States v. Klimavicius-Viloria,*
  144 F.3d 1249 (9th Cir. 1998) ........................................................... 37

*United States v. Mejia,*
  448 F.3d 436 (D.C. Cir. 2006) ..................................................... 36, 37

*United States v. Moalin,*
  973 F.3d 977 (9th Cir. 2020) ............................................................. 23

*United States v. Muhtorov,*
  20 F.4th 558 (10th Cir. 2021) ...................................................... 31, 32

*United States v. Osborne,*
  424 F. Supp. 70 (E.D. Pa. 1976) ....................................................... 28

iv

*United States v. Sanders,*
   107 F.4th 234 (4th Cir. 2024) .......................................................... 33, 34

*United States v. Shaw,*
   No. 23-11505, 2024 WL 1757319 (11th Cir. Apr. 24, 2024) ................. 6

*United States v. Trevino,*
   89 F.3d 187 (4th Cir. 1996)................................................................ 17

*United States v. Williams,*
   580 F.2d 578 (D.C. Cir. 1978) ............................................................ 27

*United States v. Williams,*
   10 F.3d 1070 (4th Cir. 1993)............................................................... 30

*Wood v. Bartholomew,*
   516 U.S. 1 (1995)................................................................................. 29

**Statutes, Legislative Materials, Rules, and Other Authorities**

Pub. L. No. 95-511, 92 Stat. 1783 (1978) ................................................ 24

18 U.S.C. § 922 ......................................................................................... 7

18 U.S.C. § 1366 ...................................................................................... 7, 8

18 U.S.C. § 3231 ....................................................................................... 3

18 U.S.C. § 3504 ........................................... 4, 11, 12, 15, 20–28

18 U.S.C. app. 3 § 4 ................................................................................. 37

28 U.S.C. § 1291 .......................................................................................3

50 U.S.C. § 1801 ....................................................................................... 18

50 U.S.C. § 1806 ........................ 4, 9, 11–14, 17–20, 22, 23, 25, 31, 35, 37

50 U.S.C. § 1881a ............................................................... 2, 17, 18

50 U.S.C. § 1881e .....................................................................................18

v

S. Rep. No. 95-701 (1978),
*as reprinted in* 1978 U.S.C.C.A.N. 3973 ................................. 19, 23, 24

Federal Rule of Criminal Procedure 16 ............................... 15, 33, 34, 37

Federal Rule of Criminal Procedure 41 ................................................. 14

Federal Rule of Criminal Procedure 52 ................................................. 35

Justice Manual § 9-5.001 (2026) ........................................................... 30

## INTRODUCTION

Defendant Brandon Clint Russell posted an online manifesto espousing violent white supremacist ideology and exhorting others to destroy the electrical grid to subvert society and precipitate a race war. He taught others how to identify vulnerable electrical infrastructure, proclaimed that "[p]utting [bullet] holes in [electrical] transformers … is the greatest thing someone can do," and explained how to time these attacks to cause "cascading [electrical] failure" that could "cost[] billions of dollars." He and a co-conspirator devised a plan to attack five electrical substations in Maryland.

On appeal, Russell does not dispute that he conspired to damage an energy facility, the offense for which he was convicted, or challenge his sentence. Instead, he claims he should have been furnished information about whether his electronic communications were subject to surveillance under Section 702 of the Foreign Intelligence Surveillance Act (FISA) Amendments Act. Section 702 establishes procedures for authorizing electronic surveillance "targeting [non-United States] persons reasonably believed to be located outside the

1

United States to acquire foreign intelligence information." 50 U.S.C. § 1881a(a). Despite the foreign focus of this authority, Russell claims he was subject to FISA Section 702 surveillance because of several superficial similarities between his case and the FBI's public descriptions of a planned terrorist attack that was prevented through the use of FISA Section 702 surveillance.

The FBI's statements, however, did not refer to this case, as the district court found after convening an ex parte hearing to review classified materials about whether and to what extent this case implicated FISA Section 702 surveillance. Based on that classified record, which is available to this Court, the district court was "satisfied that the Government will not introduce or otherwise use at trial or any other proceeding in this case any evidence obtained or derived from an electronic surveillance of Defendant pursuant to FISA Section 702." JA160. The district court thus did not err, let alone clearly err, in denying Russell's motions for the requested FISA information.

In any event, any error in denying Russell the requested FISA information would have been harmless given the court's careful ex parte

2

review of that classified information to determine whether any evidence came from unlawful FISA surveillance. That procedure is essentially what FISA would have prescribed if Russell had received the requested FISA information and moved to suppress evidence as unlawfully obtained. And because Russell consented to that ex parte procedure, he cannot challenge it on appeal. This Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. The court entered final judgment on August 7, 2025. JA995–1000. Russell filed a notice of appeal on August 11, 2025, JA1001–1002, giving this Court jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether the district court committed prejudicial clear error in determining that Russell was not entitled to notice of whether he was subject to FISA Section 702 surveillance and disclosure of any communications obtained through such surveillance.

2. Whether the district court correctly declined to unseal the ex parte filings containing classified information.

3

## RELEVANT STATUTORY PROVISIONS

50 U.S.C. § 1806(c) provides:

(c) Notification by United States

Whenever the Government intends to enter into evidence or otherwise use or disclose in any trial, hearing, or other proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, against an aggrieved person, any information obtained or derived from an electronic surveillance of that aggrieved person pursuant to the authority of this subchapter, the Government shall, prior to the trial, hearing, or other proceeding or at a reasonable time prior to an effort to so disclose or so use that information or submit it in evidence, notify the aggrieved person and the court or other authority in which the information is to be disclosed or used that the Government intends to so disclose or so use such information.

18 U.S.C. § 3504(a) provides:

(a) In any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, or other authority of the United States—

(1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act; . . .

4

## STATEMENT

### A.    Russell devises a plan to destroy electrical grid infrastructure in Maryland

In 2022, Russell posted a manifesto to a Telegram group chat whose members included an FBI confidential human source. JA412–413, JA416–417. The manifesto espoused violent white supremacist ideology and exhorted others to destroy the electrical grid to subvert society. JA982.

After reviewing the manifesto, the FBI source began direct online communications with Russell. JA420. They discussed how to more widely disseminate Russell's manifesto. JA420–426. They also discussed ways to destroy electrical grid infrastructure. Russell wrote that mylar balloons, which "are available at the dollar store," "can short transformers and melt wires just by coming near a high-voltage line. . . . Have fun." JA433. Russell advised the FBI source to "get a roll of twine and attach to the bottom of the [balloon] strings so if they miss [electrical] lines you can pull them back into place." JA433–434.

Russell and the FBI source also developed a plan to destroy an electrical transformer with gunshots. Russell wrote that "[p]utting holes

5

in transformers . . . is the greatest thing someone can do." JA437.

Russell, who lived in Florida, sent the FBI source a map of critical

electrical grid infrastructure facilities in the mid-Atlantic region, where

the FBI source lived. JA431–432, JA444–445, JA447–450. He helped

the FBI source identify the transformers at an electrical substation,

asked the FBI source if he knew what a brass catcher for a rifle was,[1]

sent a winking emoji, and told the FBI source to "[l]eave nothing."

JA441. When the FBI source asked, "One transformer or do I need all of

them?" Russell replied, "Why not all?" JA441. Russell told the FBI

source to go for "[c]enter mass, bigger, more penetrating round the

better." JA442.

    Russell told the FBI source how to time the attack to maximize

the damage. Russell encouraged the FBI source to act "when there's

greatest strain on grid, like when everyone is using electricity to either

---

[1] A brass catcher is "a device designed to capture spent bullet casings, often made of brass, as they are ejected from a firearm." *United States v. Shaw*, No. 23-11505, 2024 WL 1757319, at *1 n.2 (11th Cir. Apr. 24, 2024) (per curiam).

heat or cool their homes." JA442; *see also* JA446. He explained that, "with all this strain on that region[']s grid, if a substation or two went down there, there would be a very high likelihood of a cascading failure where something fails and the rest of the grid picks up the slack but it's too much to bear so it all fails." JA431–432. This "cascading failure," he wrote, could "cost[] billions of dollars." JA446.

When Russell learned that the FBI source lived in Maryland, Russell told him about another individual in Maryland, Sarah Beth Clendaniel, who was also planning an attack on the electrical grid.[2] JA452–455. Russell told the FBI source that Clendaniel was "a felon and had [her] weapon stolen" and was "struggling to get a new one" for the attack. JA455. Russell asked the FBI source to buy a weapon for

---

[2] Clendaniel was charged with one count of conspiracy to damage an energy facility in violation of 18 U.S.C. § 1366(a) and one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). JA025–028; Superseding Information, *United States v. Clendaniel*, No. 1:23-cr-00056-JKB (D. Md. Apr. 23, 2024), Dkt. No. 80. She pleaded guilty and was sentenced to eighteen years in prison. Judgment, *United States v. Clendaniel*, No. 1:23-cr-00056-JKB (D. Md. Sept. 25, 2024), Dkt. No. 168.

Clendaniel. JA455–456. Russell then gave Clendaniel the FBI source's contact information so they could discuss the plan directly. JA456–457. After further discussions with Russell and Clendaniel, the FBI source agreed to use a 3D printer to build firearm accessories for Clendaniel. JA460–461, JA481, JA492–495. Together, they devised a plan to attack five electrical substations in Maryland. JA505, JA983.

Throughout the scheme, Russell sought to hide his involvement. He used an encrypted messaging application and repeatedly deleted his messages with the FBI source "for security." JA443, JA466. He deleted the map of electrical grid infrastructure from his computer, JA705–706, told the FBI source to "[b]uy everything with cash to be safe," JA434, and taught Clendaniel how to use a virtual private network, JA708, JA867–869.

## B.    District court proceedings

1. Russell was arrested before the planned attack was to take place. JA174. A grand jury in the District of Maryland returned an indictment charging him with conspiracy to damage an energy facility in violation of 18 U.S.C. § 1366(a). JA025–028.

8

2. Before trial, Russell moved, pursuant to 50 U.S.C. § 1806(c), to compel the government to provide notice of its intent to use any information obtained or derived from FISA Section 702 surveillance of his communications. JA029–065. The motion was based on several apparent similarities between Russell's case and the FBI's public descriptions of a planned terrorist attack that had been prevented through the use of FISA Section 702 surveillance, like the year (2023), general target (U.S. critical infrastructure), and the involvement of a person in the United States. JA033–037. Russell claimed that these similarities indicated that he had been subject to FISA Section 702 surveillance. JA033–037.

In response, the government stated that whether a particular person's communications were collected under FISA is generally a classified fact that the government could not disclose on the public record. JA124, JA126. However, the government acknowledged its awareness of FISA's notice obligations, set forth the standard for when FISA notice is required, and stated that it had determined that no such

9

notice was required in this case. Gov't's Resp. to Mot. to Compel Notice

of FISA Information 2 ("Gov't's FISA Resp."), Dkt. No. 110.

Noting that the motion raised complex issues and implicated

classified information, the district court denied it without prejudice and

ordered an ex parte, in camera hearing with the government to

determine whether and to what extent FISA Section 702 surveillance

was implicated in the case. JA124–131, JA153–156. When asked

whether the defense objected to this procedure, Russell's counsel stated:

> The defense has no objection to an ex parte
> discussion about . . . whether any of Mr. Russell's
> communications have been acquired pursuant to
> § 702. The defense does, however, object to any ex
> parte discussion of whether the Government
> believes its evidence is derived from that
> authority because that derived question has to be
> litigated in an adversarial context . . . .
>
> What we would accept and would welcome if it
> would provide the Court more assurance that if
> we move forward with a Motion to Suppress is an
> *ex parte* discussion about whether any of Mr.
> Russell's communications ever were acquired
> pursuant to § 702 . . . .

JA125–126; *see also* JA156.

At the conclusion of the ex parte hearing, the district court

explained that it was "satisfied that the Government will not introduce

10

or otherwise use at trial or any other proceeding in this case any evidence obtained or derived from an electronic surveillance of Defendant pursuant to FISA Section 702." JA160. The court thus concluded that Russell was not entitled to notice under § 1806(c). JA160. The court also issued a sealed, ex parte, classified report further explaining its findings. SA03–09.

Russell repeatedly reserved the right to move to suppress the government's trial evidence on the ground that it was obtained or derived from unlawful FISA surveillance. JA068; JA077–078; JA129–130. The court acknowledged Russell's right to move to suppress on any colorable basis. JA130. However, Russell never moved to suppress, never requested an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), and never objected to any of the government's trial evidence on the ground that it had been unlawfully obtained.

Russell then moved under 18 U.S.C. § 3504 to compel the government to disclose whether he had been subject to FISA Section 702 surveillance. JA161–201. Like the motion to compel notice under § 1806(c), the § 3504 motion was based on this case's apparent

11

similarities to the FBI's public descriptions of the planned terrorist attack prevented through the use of FISA Section 702 surveillance. JA169–170, JA173–175.

The district court questioned whether § 3504 applied to FISA surveillance, but concluded that even if it did, Russell had not made a prima facie showing that he had been subject to FISA Section 702 surveillance. JA258–262. The court found that the FBI's "fairly generic" public statements about the planned terrorist attack prevented through the use of FISA Section 702 surveillance were "not so closely tied to the facts of this case as to make any connection between those statements and this case more than speculative." JA260–261; *see also* JA116. The court observed that the FBI's statements could refer to an unknown number of nonpublic cases. JA261; *see also* JA115. The court thus denied the motion.

For similar reasons, the district court also denied Russell's motion for notice of whether he had been subject to FISA Section 702 surveillance and for disclosure of any such communications. JA257–258, JA262–270. The court additionally denied Russell's renewed motion for

12

notice under § 1806(c) on the same grounds on which it denied the prior § 1806(c) motion. JA257–258.

Russell then moved to unseal the government's classified ex parte submission at the ex parte hearing and the court's ex parte, classified report following the hearing. JA194–197. The district court denied the motion on the ground that Russell had consented to those ex parte procedures. JA270–271.

3. Russell's five-day jury trial occurred in 2025. One of the government's key witnesses was the FBI confidential human source, who testified about his electronic communications with Russell. JA416–468. The source testified that he had taken screenshots of his written communications with Russell and had recorded his voice call with Russell. JA982. The source testified that all these communications were directly between the source and Russell, had been sent to private group chats whose members included the source, or had been sent to discussion forums or channels open to the source. JA416–468.

The jury also heard from two other FBI agents who testified about Russell's electronic communications with Clendaniel and others.

13

JA333–383, JA698–732. The agents testified that these communications were obtained from electronic devices seized from Russell, his residence, Clendaniel, and her residence pursuant to search warrants under Federal Rule of Criminal Procedure 41. *Id.*

After deliberating for about an hour, the jury found Russell guilty. JA943–947, JA979. He was sentenced to 20 years in prison and a life term of supervised release. JA995–1000.

## SUMMARY OF ARGUMENT

The district court did not err, let alone clearly err, in denying Russell's motion to compel notice of whether he was subject to FISA Section 702 surveillance and the disclosure of any of his communications obtained through such surveillance. The government did not use at trial any information obtained or derived from FISA Section 702 surveillance of Russell, as the district court found after reviewing the classified record. Russell was thus not entitled to notice under FISA's notice provision, 50 U.S.C. § 1806(c). Russell's argument to the contrary is based on superficial similarities between this case and the FBI's public description of the planned terrorist attack prevented

14

through the use of FISA Section 702 surveillance. But the FBI's public description did not refer to this case, as the district court found based on the classified record.

Russell was also not entitled to notice under 18 U.S.C. § 3504, which establishes procedures for when a party claims that illegally obtained electronic surveillance is inadmissible. That statute does not apply to FISA surveillance, which raises unique national security concerns and which is instead governed by FISA's notice provision. And even if § 3504 applied to FISA surveillance, Russell's attempt to show that he was aggrieved as required by § 3504, based on the same superficial comparison to the other case, was deficient.

Nor was Russell entitled to notice and disclosure under the Due Process Clause or Federal Rule of Criminal Procedure 16. The district court did not err, let alone clearly err, in finding, after reviewing the classified record, that the information sought by Russell was not favorable to him or material to his defense. And contrary to Russell's contention, it was not unconstitutional for the district court to make that finding based on its ex parte review of classified information.

15

In all events, any error was harmless. The only reason Russell identified for seeking this FISA information was for a potential motion to suppress. The district court employed essentially the same procedures prescribed by FISA for deciding suppression motions: the court reviewed the classified record ex parte and in camera and determined that no further relief was warranted. The result would thus have been the same regardless of whether Russell had received the requested FISA information.

Finally, Russell was not entitled to the classified record or the district court's classified findings because he expressly consented to the ex parte procedures that the district court followed. This Court should affirm.

## ARGUMENT

### I.    RUSSELL WAS NOT ENTITLED TO THE REQUESTED INFORMATION ABOUT FISA SECTION 702 SURVEILLANCE

This Court reviews a denial of a motion to compel based on factual findings for clear error. *United States v. Trevino*, 89 F.3d 187, 190 (4th Cir. 1996).

16

### A.    Russell was not entitled to notice under 50 U.S.C. § 1806(c)

Congress enacted FISA in 1978 "to authorize and regulate certain governmental electronic surveillance of communications for foreign intelligence purposes." *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 402 (2013). As part of the FISA Amendments Act of 2008, Congress added Section 702, 50 U.S.C. § 1881a, which "supplements pre-existing FISA authority by creating a new framework" for "certain foreign intelligence surveillance targeting the communications of non-U.S. persons located abroad." *Clapper,* 568 U.S. at 404. Section 702 specifies that surveillance under that section "may not intentionally target": (1) "any person known at the time of acquisition to be located in the United States"; (2) a person outside the United States "if the purpose . . . is to target a particular, known person reasonably believed to be in the United States"; or (3) "a United States person reasonably believed to be located outside the United States."[3] 50 U.S.C. § 1881a(b).

---

[3] A "United States person," as to natural persons, means a U.S. citizen or lawful permanent resident. 50 U.S.C. § 1801(*i*).

17

FISA requires the government to provide notice if it "intends to enter into evidence or otherwise use or disclose in any trial, hearing, or other proceeding . . . , against an aggrieved person, any information obtained or derived from an electronic surveillance of that aggrieved person pursuant to" FISA. 50 U.S.C. § 1806(c); *see also id.* § 1881e(a) (extending this notice requirement to information acquired under Section 702); *Clapper*, 568 U.S. at 421 ("[I]f the Government intends to use or disclose information obtained or derived from [FISA surveillance] in judicial . . . proceedings, it must provide advance notice of its intent . . . ."). This provision reflects the careful balance Congress struck between the "need to preserve secrecy for sensitive counterintelligence sources and methods" and fairness to litigants when "the fruits [of FISA surveillance] are to be used against [them] in legal proceedings." S. Rep. No. 95-701, at 11–12 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 3973, 3979–80; *accord In re Sealed Case*, 310 F.3d 717, 741 (F.I.S.C.R. 2002) (per curiam).

Here, Russell has not shown that the government used at trial any information obtained or derived from FISA surveillance of him as

required to trigger § 1806(c)'s notice obligation. The government stated that such notice was not required in this case. Gov't's FISA Resp. at 2. The district court, after reviewing the classified record and convening a classified ex parte hearing, agreed. JA160; *see also* JA257. The district court's classified ex parte report provides more extensive findings explaining why no § 1806(c) notice was required. SA03–09. Those findings were not clearly erroneous.

Russell's argument for § 1806(c) notice (at 32–41) is based entirely on superficial similarities between this case and the FBI's public description of a planned terrorist attack prevented through the use of FISA Section 702 surveillance, like the year (2023), general target (U.S. critical infrastructure), and the involvement of a person in the United States. JA173–175. Despite these superficial similarities, however, the FBI's statements did not refer to this case, as the district court found based on the classified record. SA08. As the district court explained, the FBI's public description, "while *consistent* with the facts of this case, is not so closely tied to the facts of this case as to make any connection

19

between those statements and this case more than speculative."[4] JA

260–261 (emphasis in original). There was thus no clear error in the

denial of Russell's motion to compel § 1806(c) notice.

### B.    Russell was not entitled to notice under 18 U.S.C. § 3504

Russell next appeals the denial of his motion to compel the

government to confirm or deny, pursuant to 18 U.S.C. § 3504, whether

he was subject to FISA Section 702 surveillance. Section 3504, however,

does not apply to FISA surveillance, which "presents special national-

security concerns" and which is therefore instead governed by FISA's

"special procedures." *FBI v. Fazaga*, 595 U.S. 344, 348 (2022).

Regardless, even if § 3504 applied to FISA surveillance, the district

---

[4] Russell contends (at 12–13) that the FBI's public description of the planned terrorist attack is not consistent with any other public federal criminal case he has identified. But as the district court noted, that contention overlooks many other matters that the FBI's public description could refer to — like sealed cases, cases still at the investigative stage, cases charged at the state level or in foreign countries, and cases resolved through non-criminal dispositions. JA261; *see also* JA115.

20

court correctly concluded that Russell failed to make the necessary prima facie showing that he was a "party aggrieved" under § 3504.

### 1. Section 3504 does not apply to FISA surveillance

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 established procedures to regulate wiretapping and electronic surveillance, including by prohibiting the use of illegal interceptions as evidence in official proceedings. *Gelbard v. United States*, 408 U.S. 41, 46 (1972). Two years later, Congress enacted 18 U.S.C. § 3504 to "address[] 'litigation concerning sources of evidence'" under Title III, *United States v. Apple*, 915 F.2d 899, 904 (4th Cir. 1990) (citation omitted), by "establish[ing] procedures to be followed" when a party claims that illegally obtained electronic surveillance is inadmissible, *Gelbard*, 408 U.S. at 54. Section 3504 provides, in relevant part, that, "upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act." 18 U.S.C. § 3504(a).

21

Eight years later, Congress enacted FISA to "comprehensive[ly] . . . regulate[] foreign intelligence surveillance." *In re Grand Jury Subpoena (T-112)*, 597 F.3d 189, 199 (4th Cir. 2010) ("*T-112*"). Congress recognized that while "[e]lectronic surveillance for ordinary criminal law enforcement purposes is governed by Title III . . . [,] foreign intelligence surveillance presents special national-security concerns, and Congress therefore enacted FISA to provide special procedures for use when the Government wishes to conduct such surveillance." *Fazaga*, 595 U.S. at 348 (citation omitted); *accord T-112*, 597 F.3d at 198–99 ("Congress has long recognized that a separate set of guidelines and rules are needed in the foreign intelligence context."). These special procedures include the FISA notice provision in § 1806, which reflects Congress's judgment that the "need to preserve secrecy for sensitive counterintelligence sources and methods justifies elimination" of the "requirement of subsequent notice to the [FISA] surveillance target . . . unless the fruits are to be used against him in legal proceedings." S. Rep. No. 95-701, at 11–12; *accord United States v. Moalin*, 973 F.3d 977, 1000–01 (9th Cir. 2020) ("[T]he need for secrecy

22

inherent in foreign intelligence investigations justifies a more circumscribed notice requirement than in the ordinary criminal context.").

This comprehensive and carefully reticulated foreign intelligence surveillance scheme makes clear that § 1806, not § 3504, constitutes the exclusive statutory basis governing when the government must notify a party whether she was subject to FISA surveillance. As the Supreme Court has explained, "a specific policy embodied in a later federal statute should control [the] construction of the [earlier] statute, even though it ha[s] not been expressly amended." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (citation omitted) (second and third brackets in original); *accord RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general," particularly where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." (citations omitted) (alteration in original)). Thus, "FISA's particularized notice, disclosure, and suppression procedures supplant

23

the requirements of § 3504."[5] *United States v. Aziz*, 228 F. Supp. 3d 363, 370 (M.D. Pa. 2017).

Employing similar reasoning, this Court has concluded in an analogous context that § 3504 does not apply to FISA surveillance. In *T-112*, a grand jury subpoena recipient asked the government whether it had been subject to electronic surveillance under Title III or FISA. 597 F.3d at 192. The government denied that the subpoena recipient had

---

[5] Below, Russell contended that FISA's legislative history evinces a congressional understanding that § 3504 would apply to FISA surveillance. JA176, JA242 (citing S. Rep. No. 95-701, at 63). But that report addressed a prior version of the bill whose text expressly referenced § 3504. *See* S. Rep. No. 95-701, at 88–89 (prior version of what became § 1806; providing for in camera and ex parte review "[w]henever any court is notified in accordance with subsection (c), or whenever a motion is made by an aggrieved person . . . to suppress evidence on the grounds that it was obtained or derived from an unlawful electronic surveillance, *or whenever any motion or request is made by an aggrieved person pursuant to section 3504 of [Title 18]* or any other statute or rule of the United States, to discover, obtain or suppress evidence or information obtained or derived from electronic surveillance" (emphasis added)). The bill ultimately enacted as FISA, however, contained no such reference to § 3504, eliminating any implication that Congress intended § 3504 to apply to FISA surveillance. *See* Pub. L. No. 95-511, § 106, 92 Stat. 1783, 1793–95 (1978).

24

been subject to Title III surveillance but refused to disclose whether the recipient had been subject to FISA surveillance. *Id.* On appeal, this Court concluded that the recipient was not entitled to notice of whether it had been subject to FISA surveillance because unlike § 3504, FISA's notice provision does not apply at the grand jury stage. *Id.* at 197–200; *see also* 50 U.S.C. § 1806(c). As the Court explained, "Congress has long recognized that a separate set of guidelines and rules are needed in the foreign intelligence context," and "we must give proper weight to the different ways Congress drafted the notice . . . provisions of Title III and FISA." *Id.* at 198–99. While *T-112* addressed FISA notice obligations in the specific context of grand jury proceedings, its reasoning logically implies that § 3504 does not apply to FISA surveillance at any stage.

Because § 3504 does not apply to FISA surveillance, Russell was not entitled under § 3504 to compel the government to confirm or deny whether he had been subject to FISA Section 702 surveillance.

25

### 2.    In any event, Russell failed to make the necessary showing that he was aggrieved under § 3504

Even if § 3504 did apply to FISA surveillance, Russell failed to show that he was a "party aggrieved" as required by § 3504. *Apple*, 915 F.2d at 905.

This Court has explained that "before the government's obligation [under § 3504(a)] to affirm or deny is triggered," "a party claiming to be the victim of illegal electronic surveillance must first demonstrate that his interests were affected." *Id.* To satisfy this statutory standing requirement, the party must "make a prima facie showing that he was 'aggrieved' by the surveillance; that is, that he was a party to an intercepted communication, that the government's efforts were directed at him, or that the intercepted communications took place on his premises." *Id.* This "critical showing" must have a "colorable basis" beyond "mere suspicion," *id.* (citation omitted), because "unsubstantiated allegations are too easily made to justify the expense and delay which would result from requiring the government to dispel every allegation, no matter how frivolous," *In re Grand Jury*

26

*Investigation*, 431 F. Supp. 2d 584, 591 (E.D. Va. 2006) (citation omitted). *See also Apple*, 915 F.2d at 906–07 (finding that defendant failed to make this showing because he did not aver "that he completed telephone calls to the number known to have been tapped during the period that surveillance took place"); *United States v. Williams*, 580 F.2d 578, 584 (D.C. Cir. 1978) (similar).

Here, as in *Apple*, Russell did not identify any specific call, conversation, or electronic communication that he alleges was unlawfully surveilled under FISA Section 702. JA 260. Instead, his attempt to establish his aggrieved status was based entirely on the superficial comparison between this case and the FBI's public statements about the planned terrorist attack prevented through the use of FISA Section 702 surveillance. JA173–175. That attempt was deficient because the FBI's statements did not refer to this case, as the district court correctly found as explained above (at 19–20).[6] *See* SA08;

---

[6] Russell cites (at 24) three out-of-Circuit district court decisions purportedly holding that § 3504 allows a defendant to rely on inferences to show that he is aggrieved. Two of those decisions, however, addressed only the sufficiency of the government's confirmation or denial, not the

27

JA 260–261, JA262 n.4, JA115. Because Russell failed to make the necessary showing that he was aggrieved under § 3504, the district court correctly denied his motion to compel under § 3504.

### C.    Russell was not entitled to notice under the Due Process Clause

Russell contends (at 25–32) that due process also entitled him to notice of whether he was subject to FISA Section 702 surveillance and disclosure of any of his communications obtained through such surveillance. Due process requires the government to disclose evidence in the prosecution team's possession that is "favorable to an accused . . .

---

sufficiency of the defendant's showing that he was aggrieved. *See United States v. Osborne*, 424 F. Supp. 70, 71–72 (E.D. Pa. 1976); *United States v. Carter*, No. 19-cr-819, 2020 WL 7490401, at *4 (N.D. Ill. Dec. 21, 2020). The third decision found that a party had shown he was aggrieved by submitting six affidavits "set[ting] forth with specificity the names and telephone numbers of persons whose conversations with [the party] or his attorneys are believed to have been monitored," "the time periods during which the eavesdropping was claimed to have occurred," and specific instances of calls exhibiting "strange clicks and beeps," "hollow, echoing sound[s]," sounds resembling a tape recorder, and unidentified voices on the line. *Matter of Archuleta*, 434 F. Supp. 325, 326–27 (S.D.N.Y. 1977). That showing is nothing like the superficial similarities between this case and the FBI's public description of the planned terrorist attack prevented through the use of FISA Section 702 surveillance.

28

[and] material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Information is favorable and material when "there is a reasonable probability that, had the [information] been disclosed . . . , the result of the proceeding would have been different." *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010) (citation omitted). Information need not be disclosed, however, based on "mere speculation" that it could turn out to be favorable to the defendant or material. *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (per curiam); *see also Caro*, 597 F.3d at 619 ("Because [the defendant] can only speculate as to what the requested information might reveal, he cannot satisfy *Brady*'s requirement of showing that the requested evidence would be 'favorable to [the] accused.'").

Here, Russell failed to show the favorability and materiality of whether he was subject to FISA Section 702 surveillance. He does not contend that this information would have been exculpatory or relevant for impeachment. *See* JA263; JA161–201; JA235–253. Instead, the only potential relevance posited by Russell was for a potential motion to

29

suppress unspecified evidence.[7] JA263; JA180–181; Br. 26, 28. But as

explained above (at 17–20), and as the district court found following its

review of the classified record (JA160, JA257, SA05, SA08–09), the

government did not offer at trial any evidence obtained or derived from

FISA surveillance of Russell. There is thus no reasonable probability

that the result of the proceeding would have been different if the

district court had required the government to disclose whether he was

subject to FISA Section 702 surveillance.

Contrary to Russell's contention (at 29–32), the Due Process

Clause did not prohibit the district court from making these findings on

an ex parte basis. Courts agree that due process does not entitle a

---

[7] Russell cites (at 27) out-of-Circuit decisions holding that *Brady* requires disclosure of information potentially relevant to pretrial suppression motions but not otherwise admissible at trial. While Justice Department policy requires disclosure of such information, *see* Justice Manual § 9-5.001(C)(2) (2026), neither this Court nor the Supreme Court has determined whether its disclosure is constitutionally mandated, *see United States v. Williams*, 10 F.3d 1070, 1076–77 (4th Cir. 1993), and this Court need not resolve that question here because no evidence in this case was obtained or derived from Section 702 surveillance.

30

defendant to any FISA information except as provided for in § 1806, and that FISA's provision for in camera, ex parte review, § 1806(f), does not violate due process. *See United States v. Dhirane*, 896 F.3d 295, 300–01 (4th Cir. 2018) ("[E]very federal court to have considered the constitutionality of these [ex parte] procedures has concluded that FISA reached a reasonable and therefore constitutional balance of competing interests."); *accord United States v. Belfield*, 692 F.2d 141, 148–49 (D.C. Cir. 1982); *United States v. Abu-Jihaad*, 630 F.3d 102, 129 (2d Cir. 2010); *United States v. El-Mezain*, 664 F.3d 467, 567 (5th Cir. 2011); *United States v. Muhtorov*, 20 F.4th 558, 623–26 (10th Cir. 2021).

Nor does *Alderman v. United States*, 394 U.S. 165 (1969), support Russell's argument for disclosure. Br. 30–31, 40. In *Alderman* — a pre-FISA decision — the Supreme Court held that voluminous transcripts of conversations that had been illegally recorded should be disclosed to the defense because the task of determining whether any of those records "might have contributed to the Government's case" as to a particular defendant was "too complex" for the district court's in camera review. 394 U.S. at 180, 182, 184. *Alderman* does not apply here

31

because unlike this case, that case involved: (1) a government admission that it had used electronic surveillance on particular phone lines; (2) a government concession that the surveillance was illegal; (3) a government acknowledgment that the fruits of the surveillance were arguably relevant in determining the defendants' guilt; and (4) multiple defendants whose separate rights could not be adequately protected by in camera review. *Id.* at 167–68, 181, 184; *see Muhtorov*, 20 F.4th at 630–31 (holding that *Alderman* did not entitle defendant to notice of whether he was subject to FISA surveillance).

Russell also contends that the D.C. Circuit's decision in *Belfield* recognized a criminal defendant's due process right to "seek discovery of the logs of the [FISA surveillance] to ensure that no fruits thereof are being used against him." Br. 26 (quoting 692 F.2d at 146). In *Belfield*, the government had given FISA notice to the defendants, and the sole dispute was whether the defendants were entitled to disclosure of the FISA surveillance logs and an adversarial hearing on the legality of that surveillance. 692 F.2d at 143–44, 146–49. *Belfield* thus did not address whether due process entitles a criminal defendant to notice of

32

whether he was subject to FISA surveillance in the first place. And contrary to Russell's contention here, *Belfield* held that the defendants were not entitled to disclosure of the FISA surveillance logs or an adversarial hearing on the legality of the surveillance because "[i]n this circuit and in others, it has constantly been held that the legality of electronic, foreign intelligence surveillance may, even should, be determined on an *in camera, ex parte* basis." *Id.* at 149.

### D.    Russell was not entitled to notice under Rule 16

Finally, Russell contends (at 41–42) that his requested notice and disclosure were required by Federal Rule of Criminal Procedure 16. Under Rule 16(a)(1)(E), the government must disclose items in its possession that are "material to preparing the defense." This Court has explained that "[t]o establish materiality, the defendant bears the burden of showing 'some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor.'" *United States v. Sanders*, 107 F.4th 234, 253 (4th Cir. 2024) (quoting *Caro*, 597 F.3d at 621). This standard requires "a strong indication that [the evidence] will play an

33

important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *Caro*, 597 F.3d at 621 (citation omitted). A "conclusory allegation of materiality" is insufficient. *Sanders*, 107 F.4th at 253.

Here, for the same reasons that Russell failed to show the materiality of whether he was subject to FISA Section 702 surveillance under the Due Process Clause (*supra* at 28–30), he has failed to show materiality under Rule 16.[8] The district court thus did not abuse its discretion in denying his Rule 16 request. *See Sanders*, 107 F.4th at 253.

## II.  REGARDLESS, ANY ERROR WAS HARMLESS

Even if the district court somehow erred in denying Russell's motions to compel notice of whether he was subject to FISA Section 702 surveillance and disclosure of any such surveillance records, that error

---

[8] Russell also contends (at 42) that he was entitled to any of his statements obtained through FISA surveillance because they would constitute his "recorded statement[s]," Fed. R. Crim. P. 16(a)(1)(B), and items "obtained from" him, Fed. R. Crim. P. 16(a)(1)(E). Russell has not, however, attempted to show that the government withheld any relevant statement or any item obtained from him.

was harmless. *See* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); *Neder v. United States*, 527 U.S. 1, 15 (1999) (error is harmless if "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained'" (citation omitted)).

The only reason Russell identified for wanting this information was for a potential motion to suppress unspecified evidence on the ground that it was obtained through unlawful FISA surveillance. Br. 26, 28; JA263; JA180–181. Although Russell never filed a motion to suppress, if he had done so, FISA provides for ex parte, in camera review of such motions. 50 U.S.C. § 1806(f). As the district court observed, that is "essentially what *already happened* in this case": the court reviewed the classified record ex parte and in camera and determined that Russell was not entitled to any further relief. JA257–258 (emphasis in original); *see also* JA269.

Given the procedures employed by the district court, it is "beyond cavil" that any error in the denial of Russell's motions for FISA notice

35

and disclosure "did not contribute to the verdict" in this case. *Neder*, 527 U.S. at 17 (citation omitted); *cf. United States v. Mejia*, 448 F.3d 436, 458–59 (D.C. Cir. 2006) ("even if the court did err in failing to provide notice [that the government had filed an ex parte motion for a protective order limiting discovery of certain classified information], any such error was harmless" because "notice would not have afforded the defendants the opportunity to participate in the district court's in camera inspection").

## III.    RUSSELL WAS NOT ENTITLED TO THE SEALED CLASSIFIED RECORD

Finally, Russell contends (at 42–46) that the district court erred in denying his motion to unseal the classified record and the district court's ex parte classified report. But Russell expressly consented to these ex parte procedures as long as they did not entail ex parte litigation of whether evidence was derived from FISA surveillance. JA125–126. The ex parte proceedings were confined to what Russell consented to, as the district court explained, JA271, and as this Court can see for itself, SA03–09. Given Russell's consent to these ex parte

36

procedures, any error was invited.[9] *See United States v. Day*, 700 F.3d

713, 727 n.1 (4th Cir. 2012) ("[A] 'defendant in a criminal case cannot

complain of error which he himself has invited.'" (citation omitted)).

//

//

//

//

//

//

//

---

[9] Had Russell not consented, the government could have formally invoked the provisions authorizing these ex parte proceedings regardless of the defendant's consent. *See* 50 U.S.C. § 1806(f) (authorizing ex parte, in camera review of motions to discover or suppress FISA information); 18 U.S.C. app. 3 § 4 (authorizing ex parte, in camera review of motions to limit discovery of classified information); Fed. R. Crim. P. 16(d)(1) (authorizing ex parte review of motions to restrict discovery). Contrary to Russell's suggestion (at 45–46), these provisions are constitutional. *See United States v. Dhirane*, 896 F.3d 295, 300–01 (4th Cir. 2018) (§ 1806(f)); *United States v. Mejia*, 448 F.3d 436, 458 (D.C. Cir. 2006) (§ 4 of the Classified Information Procedures Act and Rule 16(d)(1)); *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1261–62 (9th Cir. 1998) (same).

## CONCLUSION

The judgment should be affirmed.

Respectfully submitted,

KELLY O. HAYES
United States Attorney
for the District of Maryland

JOHN A. EISENBERG
Assistant Attorney General
National Security Division

DAVID C. BORNSTEIN
Assistant United States Attorney
Chief, Appellate Division
District of Maryland

/s/ Garrett Coyle
GARRETT COYLE
Attorney, Appellate Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20005
(202) 598-2929
garrett.coyle@usdoj.gov

*Attorneys for the United States*

Dated: April 29, 2026

38

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the 13,000-word limit of Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of the brief exempted by Rule 32(f), this brief contains 7,109 words.

I further certify that this brief complies with the requirements of Rule 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook font.

/s/ Garrett Coyle
Garrett Coyle

## CERTIFICATE OF SERVICE

I certify that I filed this brief via the CM/ECF system on April 29, 2026, which caused the brief to be electronically served on all counsel of record.

/s/ Garrett Coyle
Garrett Coyle